**Exhibit B**

**State Court Filings**

Home      Search by Justices      Recent Additions      Case Type Search



The Supreme Court Records On-Line Library

**MELANIE THOMPSON V. BACKPAGE.COM LLC ET AL**

**INDEX NO.:**      **950015-2020**

[KEY TO LINKS BELOW](#)

**COUNTY CLERK INFORMATION**

| |
|---|
| [FULL CAPTION](#) |
| [SCANNED DOCUMENTS](#) |
| [CC - CIVIL INDEX INQUIRY](#) |

**COURT INFORMATION**

| |
|---|
| [CASE CAPTION](#) |
| [CASE INFORMATION](#) |
| [ATTORNEYS](#) |
| [APPEARANCES](#) |
| [MOTIONS](#) |
| [COMMENTS](#) |
| [ASSIGNED JUSTICE](#) |



SEARCH AGAIN  :    [_____]  [Search]

CLICK ON COLUMN TITLE TO SORT TABLE

**COUNTY CLERK MINUTES :**

[OPEN CASE @ NYSCEF SITE](#)

| SORT BY | DOC # | DATE DOCUMENT FILED | DOCUMENT | DESCRIPTION | MOTION # |
|---|---|---|---|---|---|
| 21 | 1 | 2020-01-21 | SUMMONS + COMPLAINT | - | - |
| 20 | 2 | 2020-01-21 | ORDER - AMENDED | ADMINISTRATIVE ORDER # 371 AMENDED HON. GEORGE J. SILVER | - |
| 19 | 3 | 2020-02-04 | ORDER - ADMINISTRATIVE | AO #40 HON. GEORGE J. SILVER | - |
| 18 | 4 | 2020-02-24 | ORDER - ADMINISTRATIVE | CMO #1 HON. GEORGE J. SILVER | - |
| 17 | 5 | 2020-02-24 | ORDER - AMENDED | ADMINISTRATIVE ORDER # 371 AMENDED HON. GEORGE J. SILVER | - |
| 16 | 6 | 2020-03-18 | PROOF OF SERVICE | AFFIDAVIT OF ORIGINAL PROCESS SERVICE ON CAMARILLO HOLDINGS, LLC | - |
| 15 | 7 | 2020-03-18 | PROOF OF SERVICE | AFFIDAVIT OF SERVICE OF ORIGINAL PROCESS ON LEEWARD HOLDINGS, LLC | - |
| 14 | 8 | 2020-03-18 | PROOF OF SERVICE | AFFIDAVIT OF SERVICE OF ORIGINAL PROCESS ON MEDALIST HOLDINGS, LLC | - |
| 13 | 9 | 2020-03-18 | PROOF OF SERVICE | AFFIDAVIT OF ORIGINAL PROCESS SERVICE ON CF HOLDINGS GP LLC | - |
| 12 | 10 | 2020-03-18 | PROOF OF SERVICE | AFFIDAVIT OF ORIGINAL PROCESS SERVICE ON AMSTEL RIVER HOLDINGS LLC | - |
| 11 | 11 | 2020-03-18 | PROOF OF SERVICE | AFFIDAVIT OF ORIGINAL PROCESS SERVICE ON ATLANTISCHE BEDRIJVEN CV | - |

| SORT BY | DOC # | DATE DOCUMENT FILED | DOCUMENT | DESCRIPTION | MOTION # |
|---|---|---|---|---|---|
| 10 | 12 | 2020-03-18 | PROOF OF SERVICE | AFFIDAVIT OF ORIGINAL PROCESS SERVICE ON BACKPAGE.COM LLC | - |
| 9 | 13 | 2020-03-18 | PROOF OF SERVICE | AFFIDAVIT OF SERVICE OF ORIGINAL PROCESS ON CARL A. FERRER | - |
| 8 | 14 | 2020-03-18 | PROOF OF SERVICE | AFFIDAVIT OF ORIGINAL PROCESS SERVICE ON CF AQUISITIONS LLC | - |
| 7 | 15 | 2020-03-18 | PROOF OF SERVICE | AFFIDAVIT OF ORIGINAL PROCESS SERVICE ON DARTMOOR HOLDINGS LLC | - |
| 6 | 16 | 2020-03-18 | PROOF OF SERVICE | AFFIDAVIT OF ORIGINAL PROCESS SERVICE ON KICKAPOO RIVER INVESTMENTS LLC | - |
| 5 | 17 | 2020-03-18 | PROOF OF SERVICE | AFFIDAVIT OF ORIGINAL PROCESS SERVICE ON LUPINE HOLDINGS LLC | - |
| 4 | 18 | 2020-03-18 | PROOF OF SERVICE | AFFIDAVIT OF ORIGINAL PROCESS SERVICE ON UGC TECH GROUP CV | - |
| 3 | 19 | 2020-03-18 | PROOF OF SERVICE | AFFIDAVIT OF ORIGINAL PROCESS SERVICE ON WEBSITE TECHNOLOGIES LLC | - |
| 2 | 20 | 2020-03-23 | PROOF OF SERVICE | AFFIDAVIT OF ORIGINAL PROCESS SERVICE ON DEFENDANT MICHAEL LACEY | - |
| 1 | 21 | 2020-06-18 | ORDER - ADMINISTRATIVE | CMO #2 HON. GEORGE J. SILVER | - |
| | | | | | |

NEW SEARCH

Documents that have been entered into the minutes of the County Clerk bear a stamp stating "Filed," followed by the date of filing (entry date) and the words "New York County Clerk's Office." Except in matrimonial cases (documents for which are not included in Scroll), judgments are not entered by the County Clerk until an attorney for a party to the case appears at the Judgment Clerk's desk (Rm. 141B at 60 Centre Street) and requests entry. Copies of unfiled judgments bearing a stamp stating "Unfiled Judgment" and a notice to counsel may be found in Scroll. For technical reasons, some long form orders or other documents that were scanned in the early phase of this project may be categorized here as a "Decision."

60 Centre Street, New York NY 10007 Copyright © 2006 Unified Court System

NEW YORK STATE SUPREME COURT
NEW YORK COUNTY

-------------------------------------------------------------------X

MELANIE THOMPSON,

|  | Index No.: _____/_____ |
|---|---|

Date Filed: January 21, 2020

                                    Plaintiff,          **SUMMONS**

-against-

Plaintiff designates New York County as the place of trial.

BACKPAGE.COM, L.L.C.; CARL FERRER; JAMES
LARKIN; MICHAEL LACEY; MEDALIST HOLDINGS,
INC.; LEEWARD HOLDINGS, L.L.C.; CAMARILLO
HOLDINGS, L.L.C.; DARTMOOR HOLDINGS, L.L.C.;
IC HOLDINGS, L.L.C.; UGC TECH GROUP C.V.;
WEBSITE TECHNOLOGIES, LLC; ATLANTISCHE
BEDRIJVEN C.V.; AMSTEL RIVER HOLDINGS, LLC;
LUPINE HOLDINGS LLC; KICKAPOO RIVER
INVESTMENTS LLC; CF HOLDINGS GP, LLC; CF
ACQUISITIONS, LLC; and, JOHN DOE 1-5,

The basis of venue is one
plaintiff's residence.

**<u>Child Victims Act Proceeding
22 NYCRR 202.72</u>**

                                    Defendants.

-------------------------------------------------------------------X

TO THE ABOVE-NAMED DEFENDANTS:

        YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a
copy of your answer, or, if the complaint is not served with this summons, to serve a notice of
appearance, on the Plaintiff's attorneys within 20 days after the service of this summons, exclusive
of the day of service (or within 30 days after the service is complete if this summons is not
personally delivered to you within the State of New York); and in case of your failure to appear or
answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated:  January 21, 2020

                            Respectfully Yours,

MARSH LAW FIRM PLLC

By _____

James R. Marsh
151 East Post Road, Suite 102
White Plains, NY 10601-5210
Phone: 929-232-3235
jamesmarsh@marsh.law

Jennifer Freeman
151 East Post Road, Suite 102
White Plains, NY 10601-5210
Phone: 929-232-3128
jenniferfreeman@marsh.law

Robert Y. Lewis
151 East Post Road, Suite 102
White Plains, NY 10601-5210
Phone: 646-306-2145
robertlewis@marsh.law

PFAU COCHRAN VERTETIS AMALA PLLC

By _____

Michael T. Pfau
403 Columbia St.
Suite 500
Seattle, WA 98104
Phone: 206-462-4335
michael@pcvalaw.com
*Pro hac vice forthcoming*

Jason P. Amala
403 Columbia St.
Suite 500
Seattle, WA 98104
Phone: 206-462-4339
jason@pcvalaw.com
*Pro hac vice forthcoming*

2

Vincent T. Nappo
403 Columbia St.
Suite 500
Seattle, WA 98104
Phone:  206-453-0432
vnappo@pcvalaw.com
*Pro hac vice forthcoming*

Attorneys for Plaintiff

NEW YORK STATE SUPREME COURT
NEW YORK COUNTY
-------------------------------------------------------------------X

MELANIE THOMPSON,

                         Plaintiff,

-against-

BACKPAGE.COM, L.L.C.; CARL FERRER; JAMES
LARKIN; MICHAEL LACEY; MEDALIST HOLDINGS,
INC.; LEEWARD HOLDINGS, L.L.C.; CAMARILLO
HOLDINGS, L.L.C.; DARTMOOR HOLDINGS, L.L.C.;
IC HOLDINGS, L.L.C.; UGC TECH GROUP C.V.;
WEBSITE TECHNOLOGIES, LLC; ATLANTISCHE
BEDRIJVEN C.V.; AMSTEL RIVER HOLDINGS, LLC;
LUPINE HOLDINGS LLC; KICKAPOO RIVER
INVESTMENTS LLC; CF HOLDINGS GP, LLC; CF
ACQUISITIONS, LLC; and, JOHN DOE 1-5,

                         Defendants.
-------------------------------------------------------------------

Index No.:  _____/_____

**COMPLAINT**

**Child Victims Act Proceeding**
**22 NYCRR 202.72**

Plaintiff Melanie Thompson, by and through her attorneys, the Marsh Law Firm PLLC and

Pfau Cochran Vertetis Amala PLLC, respectfully alleges for her complaint the following:

**INTRODUCTION**

1.     Starting when she was approximately 12 years old, Plaintiff Melanie Thompson

was trafficked and sold for sex on the website www.backpage.com.  Melanie bring this action

against the Backpage Defendants to hold them accountable for intentionally creating an online

marketplace to purchase sex via the website www.backpage.com, where they knew countless

women and children were being sexually exploited.  Despite that knowledge, the Backpage

Defendants helped sex traffickers create and develop sex advertisements so the Backpage

Defendants could profit from the ads.  The Backpage Defendants not only advised sex traffickers

how to avoid detection by law enforcement and maximize their profits, they actively sanitized sex

Case 1:20-cv-06734-UA   Document 1-2   Filed 08/21/20   Page 8 of 92

ads to make it less obvious that the ads were for sex, including sex with minors.  Through these illicit activities the Backpage Defendants generated hundreds of millions of dollars in profits from the illegal sex ads posted on www.backpage.com before the website was seized and permanently shut down by federal law enforcement in April 2018.

### PROCEEDING IN ACCORDANCE WITH CPLR 214-G AND 22 NYCRR 202.72

2.      This complaint is filed, in part, pursuant to the Child Victims Act (CVA) 2019 Sess. Law News of N.Y. Ch. 11 (S. 2440), CPLR 214-G, and 22 NVCRR 202.72. The CVA opened a historic one-year one-time window for victims and survivors of childhood sexual abuse in the State of New York to pursue lapsed claims. Prior to the passage of the CVA, Plaintiff's claims were time-barred the day she turned 22 years old.

### PARTIES

3.      Plaintiff Melanie Thompson was approximately 12 to 17 years old when she was trafficked in the sex trade through the www.backpage.com website.  Melanie is currently a resident of Richmond County, New York.

4.      Defendant Backpage.com, L.L.C., is a Delaware limited liability company.  During the time that Plaintiff was advertised for sex on www.backpage.com, Backpage.com, L.L.C. owned, operated, designed and controlled the website, including its content.  Backpage.com, L.L.C., also profited from the website www.backpage.com, including the sex ads posted of Plaintiff and of other women and children, even though it knew those profits were derived from illegal conduct.  At all times material hereto, defendant Backpage.com, L.L.C., transacted business in New York County, New York, and purposefully availed itself of New York County, New York, and the citizens of New York County, New York, including through the www.backpage.com website.

2

5.      Defendant Carl Ferrer is a resident of Texas.  Before and during the time that Plaintiff was advertised for sex on www.backpage.com, defendant Carl Ferrer owned, operated, designed, and controlled the website, including its content.  Mr. Ferrer also profited from the website www.backpage.com, including the sex ads posted of Plaintiff and of other women and children, even though he knew those profits were derived from illegal conduct.  At all times material hereto, defendant Carl Ferrer transacted business in New York County, New York, and purposefully availed himself of New York County, New York, and the citizens of New York County, New York, including through the www.backpage.com website.

6.      Defendant Michael Lacey is a resident of Arizona.  Before and during the time that Plaintiff was advertised for sex on www.backpage.com, defendant Michael Lacey owned, operated, designed, and controlled the website, including its content.  Mr. Lacey also profited from the website www.backpage.com, including the sex ads posted of Plaintiff and of other women and children, even though he knew those profits were derived from illegal conduct.  At all times material hereto, defendant Michael Lacey transacted business in New York County, New York, and purposefully availed himself of New York County, New York, and the citizens of New York County, New York, including through the www.backpage.com website.

7.      Defendant James Larkin is a resident of Arizona.  Before and during the time that Plaintiff was advertised for sex on www.backpage.com, defendant James Larkin owned, operated, designed, and controlled the website, including its content.  Mr. Larkin also profited from the website www.backpage.com, including the sex ads posted of Plaintiff and of other women and children, even though he knew those profits were derived from illegal conduct.  At all times material hereto, defendant James Larkin transacted business in New York County, New York, and

purposefully availed himself of New York County, New York, and the citizens of New York County, New York, including through the www.backpage.com website.

8.      Defendant Medalist Holdings Inc. is a Delaware limited liability company.  During the time that Plaintiff was advertised for sex on www.backpage.com, Medalist Holdings, L.L.C., owned, operated, designed and controlled the website, including its content.  Defendant Medalist Holdings L.L.C., also profited from the website www.backpage.com, including the sex ads posted of Plaintiff and of other women and children, even though it knew those profits were derived from illegal conduct.  At all times material hereto, defendant Medalist Holdings, L.L.C., transacted business in New York County, New York, and purposefully availed itself of New York County, New York, and the citizens of New York County, New York, including through the www.backpage.com website.

9.      Defendant Leeward Holdings, L.L.C., is a Delaware limited liability company.  During the time that Plaintiff was advertised for sex on www.backpage.com, Leeward Holdings, L.L.C., owned, operated, designed and controlled the website, including its content.  Defendant Leeward Holdings, L.L.C., also profited from the website www.backpage.com, including the sex ads posted of Plaintiff and of other women and children, even though it knew those profits were derived from illegal conduct.  At all times material hereto, defendant Leeward Holdings, L.L.C., transacted business in New York County, New York, and purposefully availed itself of New York County, New York, and the citizens of New York County, New York, including through the www.backpage.com website.

10.      Defendant Camarillo Holdings, L.L.C., is a Delaware limited liability company.  During the time that Plaintiff was advertised for sex on www.backpage.com, Camarillo Holdings, L.L.C., owned, operated, designed and controlled the website, including its content.  Defendant

Case 1:20-cv-06734-UA Document 1-2 Filed 08/21/20 Page 11 of 92

Camarillo Holdings, L.L.C., also profited from the website www.backpage.com, including the sex ads posted of Plaintiff and of other women and children, even though it knew those profits were derived from illegal conduct. At all times material hereto, defendant Camarillo Holdings, L.L.C., transacted business in New York County, New York, and purposefully availed itself of New York County, New York, and the citizens of New York County, New York, including through the www.backpage.com website.

11.     Defendant Dartmoor Holdings, L.L.C., is a Delaware limited liability company. During the time that Plaintiff was advertised for sex on www.backpage.com, Dartmoor Holdings, L.L.C., owned, operated, designed and controlled the website, including its content. Defendant Dartmoor Holdings, L.L.C., also profited from the website www.backpage.com, including the sex ads posted of Plaintiff and of other women and children, even though it knew those profits were derived from illegal conduct. At all times material hereto, defendant Dartmoor Holdings, L.L.C., transacted business in New York County, New York, and purposefully availed itself of New York County, New York, and the citizens of New York County, New York, including through the www.backpage.com website.

12.     Defendant IC Holdings, L.L.C., is a Delaware limited liability company. During the time that Plaintiff was advertised for sex on www.backpage.com, IC Holdings, L.L.C., owned, operated, designed and controlled the website, including its content. IC Holdings, L.L.C., also profited from the website www.backpage.com, including the sex ads posted of Plaintiff and of other women and children, even though it knew those profits were derived from illegal conduct. At all times material hereto, defendant IC Holdings, L.L.C., transacted business in New York County, New York, and purposefully availed itself of New York County, New York, and the citizens of New York County, New York, including through the www.backpage.com website.

13.     Defendant UGC Tech Group C.V. is a Dutch company domiciled in Curacao. During the time that Plaintiff was advertised for sex on www.backpage.com, UGC Tech Group C.V. owned, operated, designed and controlled the website, including its content.  UGC Tech Group C.V. also profited from the website www.backpage.com, including the sex ads posted of Plaintiff and of other women and children, even though it knew those profits were derived from illegal conduct.  At all times material hereto, defendant UGC Tech Group C.V. transacted business in New York County, New York, and purposefully availed itself of New York County, New York, and the citizens of New York County, New York, including through the www.backpage.com website.

14.     Defendant Website Technologies, LLC, is a Delaware limited liability company. During the time that Plaintiff was advertised for sex on www.backpage.com Website Technologies, LLC, owned, operated, designed and/or controlled the website, including its content.  Website Technologies, LLC, also profited from the website www.backpage.com, including the sex ads posted of Plaintiff and of other women and children, even though it knew those profits were derived from illegal conduct.  At all times material hereto, defendant Website Technologies, LLC, transacted business in New York County, New York, and purposefully availed itself of New York County, New York, and the citizens of New York County, New York, including through the www.backpage.com website.

15.     Defendant Atlantische Bedrijven C.V., is a Dutch company domiciled in Curacao. During the time that Plaintiff was advertised for sex on www.backpage.com Atlantische Bedrijven C.V owned, operated, designed and/or controlled the website, including its content.  Atlantische Bedrijven C.V also profited from the website www.backpage.com, including the sex ads posted of Plaintiff and of other women and children, even though it knew those profits were derived from

6

illegal conduct. At all times material hereto, defendant Atlantische Bedrijven C.V transacted business in New York County, New York, and purposefully availed itself of New York County, New York, and the citizens of New York County, New York, including through the www.backpage.com website.

16. Defendant Amstel River Holdings LLC is a Delaware limited liability company. During the time that Plaintiff was advertised for sex on www.backpage.com Amstel River Holdings LLC owned, operated, designed and/or controlled the website, including its content. Amstel River Holdings LLC also profited from the website www.backpage.com, including the sex ads posted of Plaintiff and of other women and children, even though it knew those profits were derived from illegal conduct. At all times material hereto, defendant Amstel River Holdings LLC transacted business in New York County, New York, and purposefully availed itself of New York County, New York, and the citizens of New York County, New York, including through the www.backpage.com website.

17. Defendant Lupine Holdings LLC is a Delaware limited liability company. During the time that Plaintiff was advertised for sex on www.backpage.com Lupine Holdings LLC owned, operated, designed and/or controlled the website, including its content. Lupine Holdings LLC also profited from the website www.backpage.com, including the sex ads posted of Plaintiff and of other women and children, even though it knew those profits were derived from illegal conduct. At all times material hereto, defendant Lupine Holdings LLC transacted business in New York County, New York, and purposefully availed itself of New York County, New York, and the citizens of New York County, New York, including through the www.backpage.com website.

18. Defendant Kickapoo River Investments LLC is a Delaware limited liability company. During the time that Plaintiff was advertised for sex on www.backpage.com Kickapoo

River Investments LLC owned, operated, designed and/or controlled the website, including its content. Kickapoo River Investments LLC also profited from the website www.backpage.com, including the sex ads posted of Plaintiff and of other women and children, even though it knew those profits were derived from illegal conduct. At all times material hereto, defendant Kickapoo River Investments LLC transacted business in New York County, New York, and purposefully availed itself of New York County, New York, and the citizens of New York County, New York, including through the www.backpage.com website.

19.    Defendant CF Holdings GP LLC is a Delaware limited liability company. During the time that Plaintiff was advertised for sex on www.backpage.com CF Holdings GP LLC owned, operated, designed and/or controlled the website, including its content. CF Holdings GP LLC also profited from the website www.backpage.com, including the sex ads posted of Plaintiff and of other women and children, even though it knew those profits were derived from illegal conduct. At all times material hereto, defendant CF Holdings GP LLC transacted business in New York County, New York, and purposefully availed itself of New York County, New York, and the citizens of New York County, New York, including through the www.backpage.com website.

20.    Defendant CF Acquisitions LLC is a Delaware limited liability company. During the time that Plaintiff was advertised for sex on www.backpage.com CF Acquisitions LLC owned, operated, designed and/or controlled the website, including its content. CF Acquisitions LLC also profited from the website www.backpage.com, including the sex ads posted of Plaintiff and of other women and children, even though it knew those profits were derived from illegal conduct. At all times material hereto, defendant CF Acquisitions LLC transacted business in New York County, New York, and purposefully availed itself of New York County, New York, and the citizens of New York County, New York, including through the www.backpage.com website.

8

21.     Defendants John Doe 1-5 are individuals and entities who owned, operated, designed, and controlled www.backpage.com, including its content, during and after the time that Plaintiff was advertised for sex on www.backpage.com.  Defendants John Doe 1-5 are also individuals and entities who profited from the sex ads posted on www.backpage.com, including the sex ads of Plaintiff, despite knowing that those profits were derived from illegal conduct. Defendants John Doe 1-5 include, but are not limited to, any predecessors or successors of the named defendants, as well as any current or former subsidiaries of the named defendants.

22.     The purpose of the foregoing paragraph, as well as the entirety of this complaint, is to put Defendants John Doe 1-5 on notice that they are named as defendants in this lawsuit, but that this lawsuit currently refers to them as a "John Doe" defendant because their exact identity is not known to Plaintiff at this time.  For example, the report of the United States Senate Permanent Subcommittee on Investigations, titled "Backpage.com's Knowing Facilitation of Online Sex Trafficking," attached as **Appendix A** (the "Senate Report"), provides a detailed breakdown of the ownership and control of www.backpage.com, including various individuals and entities.  To the extent any of those individuals and entities are responsible for the sex ads of Plaintiff, and to the extent any of those individuals and entities have profited from the sex ads of Plaintiff, those individuals and entities are intended to be named defendants in this lawsuit and are referred to herein as a "John Doe" defendant.  In addition, a number of entities have been used to mask the true ownership and control of www.backpage.com and the illegal profits that have been generated by sex ads on the website, including those of Plaintiff.  Any and all individuals and entities who are responsible for the sex ads of Plaintiff, or who profited from those sex ads, are named in this lawsuit as "John Doe" defendants.

9

Case 1:20-cv-06734-UA   Document 1-2   Filed 08/21/20   Page 16 of 92

23.     Defendants Backpage.com, L.L.C., Carl Ferrer, Michael Lacey, James Larkin, Medalist Holdings Inc., Leeward Holdings, L.L.C., Camarillo Holdings, L.L.C., Dartmoor Holdings, L.L.C., IC Holdings, L.L.C., UGC Tech Group C.V., Website Technologies, LLC, Atlantische Bedrijven C.V., Amstel River Holdings LLC, Lupine Holdings LLC, Kickapoo River Investments LLC, CF Holdings GP LLC, CF Acquisitions LLC, and John Doe 1-5 are collectively referred to throughout this complaint as the "Backpage Defendants" or "Backpage."

24.     To the extent any of the Backpage Defendants assert that they are not liable because of their status as a corporation, limited liability company, or other business entity, or because they were acting on behalf of a corporation, limited liability company, or other business entity, any such protections must be disregarded because the Backpage Defendants have intentionally tried to use those protections to avoid liability for their knowingly illegal conduct, including profiting from conduct that they knew was illegal.  The only way to prevent an unjustified loss to Plaintiff is to hold each of the Backpage Defendants liable and to disregard any protections that might otherwise be available because of the effort by the Backpage Defendants to abuse those protections.  This is particularly true where the Backpage Defendants have taken significant profits from conduct that they know is illegal, yet they would attempt to use those protections in order to avoid any liability or accountability for their knowingly illegal conduct and for knowingly accepting illegal profits. It is black letter law that individuals and entities, including corporate officers and owners, may be held liable if they participate in wrongful conduct or have knowledge of wrongful conduct and approve of the wrongful conduct.  Plaintiff alleges that each of the Backpage Defendants knew all of the facts that are alleged in this complaint, including the fact they were accepting significant profits from the illegal sex ads on www.backpage.com, including the sex ads of Plaintiff.

10

25.     To the extent any of the Backpage Defendants assert that they are not liable because of their status as a corporation, limited liability company, or other business entity, or because they were acting on behalf of a corporation, limited liability company, or other business entity, any such protections must be disregarded because the Backpage Defendants are the alter ego of one another. As more detailed in the Senate Report, the Backpage Defendants tried to use a wide range of entities to deflect the fact that a few individuals and entities owned and controlled www.backpage.com and took the profits from its illegal operations.  There has been such unity of ownership and interest that the separateness of the corporation has ceased to exist.

26.     As discussed more fully herein, many of the acts and omissions giving rise to this action occurred in New York County, New York; Plaintiff resides in New York County, New York, and all of the defendants conduct, or conducted, business in New York County, New York, including at the time of the acts and omissions giving rise to this lawsuit.

## VENUE

27.     Venue is proper because New York is the county in which a substantial part of the events or omissions giving rise to Plaintiff's claim occurred.

## STATEMENT OF FACTS

**A.    <u>The Backpage Defendants</u>**

28.     At all times relevant to this lawsuit, www.backpage.com has been the largest source of online human sex trafficking in the United States, with thousands of sex advertisements appearing on the backpage.com website every day.

29.     According to the Senate Report, as referenced above and below, the Backpage Defendants' owned and operated the www.backpage.com website from 2004 to 2018.  The website's annual revenue grew significantly each year.  For instance, in 2010 the website's annual

revenue was $29 million, but by 2014 annual revenue quadrupled to $135 million. The vast majority of revenue was generated from illegal ads for sex.

30.     This was not happenstance. To the contrary, Backpage.com became the largest source of online human sex trafficking in the United States because the Backpage Defendants intentionally designed and operated the website as an online marketplace for sex trafficking.

31.     More specifically, the Backpage Defendants developed the backpage.com website to superficially resemble an online classified advertising website (e.g., craiglist.org), with several seemingly innocuous generic categories organized by subject, state and/or city.

32.     In reality, the Backpage Defendants purposefully designed and operated backpage.com as a cash cow to generate revenue from the posting sex advertisements in the "escort" category of the website.

33.     As intended, the Backpage Defendants made hundreds of millions of dollars from sex ads posted on the backpage.com website. The Backpage Defendants made these profits, and kept these profits, despite knowing that the underlying revenues were generated as a result of sex trafficking.

34.     In the process, the Backpage Defendants helped sex traffickers and prostitutes evade enforcement of a wide range of laws that are intended to prevent sex trafficking, prostitution and the sexual exploitation of children.

35.     According to the most recent report from the National Center for Missing and Exploited Children, 73% of the reports it receives on suspected child sex trafficking involve backpage.com.

Case 1:20-cv-06734-UA   Document 1-2   Filed 08/21/20   Page 19 of 92

36.     The Backpage Defendants have long known that thousands of women and children were being advertised for sex on backpage.com each year, but they refused to implement any meaningful or reasonable system to prevent trafficking on their website.

37.     For example, one of the original parent companies of backpage.com, Village Voice, required photo identification proving an individual was at least 18 years old before their ad could be published in the "adult" section of its newspapers.  The company imposed this requirement to help prevent sex trafficking of women and children.

38.     However, the Backpage Defendants refused to impose this same requirement before a sex ad was posted on backpage.com because they believe the Communications Decency Act gives them immunity from suit for child sex trafficking.  The Backpage Defendants also refused to require photo identification because they knew that doing so would substantially reduce their profits.

39.     Rather than take any reasonable steps to prevent women and children from being trafficked for sex on their website, the Backpage Defendants intentionally underreported the number of child sex ads on their website.  For example, in an internal email, the Chief Operating Officer of backpage.com expressed concern with the number of ads that were being reported to the National Center for Missing and Exploited Children (NCMEC).  He suggested the website "shouldn't be [reporting] more than 16 a day" unless the Backpage Defendants wanted to risk more than 500 reports a month to NCMEC.

**B.**     **The Backpage.com Website**

40.     The Backpage Defendants purposefully designed and developed the "escort" category of the backpage.com website as an online marketplace to attract, facilitate, and ultimately profit from human sex trafficking.

41.     The Backpage Defendants created the "escort" category knowing that, in the illicit human sex trafficking industry, "escort" is virtually synonymous with prostitute and denotes a solicitation to exchange sex for money.

42.     At all relevant times, the Backpage Defendants knew that over 99% of ads posted in the "escort" section of backpage.com were prostitution or illicit sex ads.

43.     Nearly every ad in the "escort" section, for example, included one or more photographs of a girl in skimpy lingerie and sexually suggestive poses, such as spreading her legs at the camera or bending over and putting her thong clad rear end on display, followed by a price, such as $150 per hour, a name, and a phone number.

44.     By creating a specific category labeled "escort," the Backpage Defendants sought to attract and host illicit sex trafficking on the backpage.com website.  The Backpage Defendants also created the "escort" category to conceal the illegal nature of the sex trafficking that they were purposefully attracting to backpage.com, and to provide a safe haven for sex traffickers, pimps, prostitutes, and johns to operate outside the reach of law enforcement.

45.     In exchange for this cover, the Backpage Defendants charged a fee for each sex ad. Their business model was enormously successful: as noted, over the past few years, the Backpage Defendants made hundreds of millions of dollars in profits from sex trafficking advertisements on backpage.com.

## C.     **Backpage's Policies and Practices Designed to Facilitate Sex Trafficking**

46.     In addition to its design and layout, the Backpage Defendants purposefully employed a sophisticated combination of targeted policies and practices to remove blatant indicators of illegality displaying on sex ads, such as certain terms and images that would trigger criminal and/or civil liability.  The aim and effect was never to block illegal ads, but instead to mask and alter them from detection.  These policies and practices were originally developed in the

mid-2000s and were continuously refined over the years to stay ahead of law enforcement and the authorities. At the time Plaintiff's ads appeared on backpage.com, these policies and practices had been honed to an unprecedented level.

47. Specifically, during all relevant times, the Backpage Defendants utilized a combination of "posting rules," "content requirements," and, most critically, "moderations practices" to actively develop and materially contribute to the illegal content of prostitution and child-prostitution ads on backpage.com.

48. The Backpage Defendants implemented "posting rules" and "content requirements" under the "escort" category to which users (sex traffickers and prostitutes) were required to cursorily agree to and conform the content of their sex ads. None of the "posting rules" or "content requirements" were implemented to prevent or discourage sex trafficking on backpage.com. For example, in 2012, Defendant Carl Ferrer, who has been the CEO of backpage.com for many years, wrote to the Chief Operating Officer of backpage.com and complained that sex traffickers needed to be informed what specific term(s) would prevent their ads from being posted on backpage.com. The only reasonable inference is that Mr. Ferrer wanted sex traffickers to know what term(s) they needed to change or delete so that their sex trafficking ad could be sufficiently sanitized and then posted on the website.

49. Instead, the Backpage Defendants specifically designed and developed the "posting rules" and "content requirements" to require users (sex traffickers and prostitutes) to post prostitution and child-prostitution ads that were less detectible by law enforcement—but were sex trafficking ads nonetheless.

50. The Backpage Defendants would not ban individual ads that blatantly included illegal prostitution in violation of the "posting rules" and "content requirements." For example,

15

Defendant Carl Ferrer expressed concern in an internal email that sex traffickers would be unhappy if the company actually banned their sex trafficking ads that violated the "posting rules" and "content requirements." Mr. Ferrer concluded that banning the sex trafficking ads would be "too harsh." Instead, Mr. Ferrer directed the employees of the Backpage Defendants that it was "[b]etter to edit by removing bad text or removing bad language" so that sex traffickers could "adjust."

51.     The Backpage Defendants would also decline to ban users (sex traffickers and sex workers) who repeatedly posted blatant ads for sex in violation of the "posting rules" and "content requirements," or report those individuals to the authorities. Nor would the Backpage Defendants report such users to the authorities.

52.     Instead, the Backpage Defendants actively and knowingly instructed sex traffickers and users how to create illegal prostitution ads that conformed with the "posting rules" and "content requirements," and were therefore less detectible by law enforcement. For example, Mr. Ferrer personally helped one sex trafficker ensure that his sex trafficking ads would be posted on the website after the Backpage Defendants locked his account for posting an ad for sex. The sex trafficker went by the username "Urban Pimp." When his ads were temporarily blocked, he complained to the Backpage Defendants that his sex ads were blocked and noted that he was trying to post sex ads in 50 cities in the United States. Rather than ban "Urban Pimp" from the website, or report him to law enforcement, Mr. Ferrer advised "Urban Pimp" that he had unblocked his account. In an email Mr. Ferrer directed "Urban Pimp" to:

> Try editing your ads now. It should work. If not, email me back direct.

53.     The Backpage Defendants also employed a sophisticated set of "moderation practices" to directly develop and enhance the illegal content of individual sex ads on backpage.com. The "moderation practices" included both manual and automated measures.

16

54. Like the "posting rules" and "content requirements," the Backpage Defendants' "moderation practices" were not intended to prevent sex trafficking. Instead, the "moderation practices" were specifically intended to develop and materially contribute to the illegal content of ads by masking, or "sanitizing," blatant indicators of illegality (certain terms and images indicative of prostitution) from known sex ads:

```
    Q.    Did they tell you why they wanted you to pull
them out?

    A.    Yeah, I guess so.  Yeah.  They did.

    Q.    And why did they tell you they wanted you to
remove those terms?

    A.    Because those terms made it clear that that
person was asking for, you know, money for prostitution.
```

55. The Backpage Defendants instructed dozens and dozens of "moderators" to review sex ads on backpage.com and "sanitize" any ad that included blatant indications of sex trafficking. The "moderators" sanitized the sex ads by manually removing or altering language and images that indicated the ad was for sex. After the offending text and/or images were removed, the "moderators" would post the remainder of the ad and the Backpage Defendants would collect their fee.

56. For example, a former backpage.com "moderator" admitted under oath that his job as a moderator for the Backpage Defendants was "to basically sanitize ads for prostitution." He admitted he sanitized ads by removing terms or images that suggested the ads were for sex for

money.  He would then post the sanitized ad, even though he knew the ad was a person who was

trying to sell sex for money:

```
    Q.    And do you agree with me if you removed

    language from an ad that blatantly sells, says that "I'm

    willing to have sex with you for money," and then you

    post the remainder, you know as the person who edited

    the ad that the ad is someone who is trying to sell sex

    for money, correct?

    A.    Yes.
```

57.    In addition to manual "moderation practices," the Backpage Defendants also

engaged in automatic "moderation" of sex ads on backpage.com.

58.    During the relevant time, every ad appearing in the "escort" category was run

through automatic filters that were programmed to recognize certain terms indicative of

prostitution.  If a sex ad contained a banned term, the filters would either strip out the term

automatically or flag the ad so that a "moderator" could manually remove the language.  The

sanitized ad would then be reposted to backpage.com.

59.    The Backpage Defendants maintained and continuously updated a banned-terms

list that was utilized by the "moderators" and the automatic filters.  The Backpage Defendants

intentionally populated the list with terms that would signal to third parties (law enforcement, the

media, victim's advocacy groups, victims' families) that the ads were soliciting prostitution and/or

sex with children.

18

60.    The Backpage Defendants intentionally and carefully crafted the banned terms list, always leaving enough information in "sanitized" sex ads posted to its website to allow for a viewer of the website to recognize that an ad was in fact for sex and for an illegal transaction to occur. Internal communications from Backpage.com's chief operations officer confirm this:

> In the case of lesser violations, editing should be sufficient.  We're still allowing phrases with nuance but if something strikes you as crude or obvious, remove the phrase.  We're still allowing HBO type nudity but if an image makes you think twice, remove the image.  There is zero tolerance for closeups of exposed genitalia.

61.    The Backpage Defendants would also consciously resist removing ads with even the most blatant terms and images indicative of illegal activity (express prostitution language, pricing terms in less than 1 hour increments, and images of exposed genitalia) choosing instead to develop the illegal content by removing the offending terms/images and thereby masking the unlawfulness of the ads.  Again, as stated by Backpage.com's Chief Operations Officer, this was done for the express purpose of assisting users (sex traffickers, prostitutes, and pimps) in developing illegal content for sex ads:

> We won't be removing ads for these violations.  These ads should be edited and "violated terms of use" should be selected.
>
> We have to be fair to the users and give them time to adapt.  Thanks.

62.    The Backpage Defendants also knowingly included terms in the banned terms list that indicated the subject of the sex ad was a child.  For example, words such as "lolita," "teenage," "rape," "young," "amber alert," "little girl," "fresh," "innocent," and "school girl" were all

manually or automatically removed from sex ads. After the ad was sanitized, the Backpage

Defendants would then post the ad on backpage.com. As explained in the Senate Report:

> Multiple Backpage documents and communications confirm the inclusion of these and other terms in the Strip Term From Ad filter.[129] Over the course of the next several months, Backpage added additional words to the Strip Term From Ad filter, including:
>
> - "amber alert" (the name of the national child abduction emergency broadcast system)[130]
>
> - "little girl"[131]
>
> - "teen"[132]
>
> - "fresh"[133]
>
> - "innocent"[134] and
>
> - "school girl."[135]
>
> When a user submitted an adult ad containing one of the above forbidden words, Backpage's filter would immediately delete the discrete word and the remainder of the ad *would be published* after moderator review. Of course, the Strip Term From Ad filter changed nothing about the real age of the person being sold for sex or the real nature of the advertised transaction. But as Padilla explained, thanks to the filter, Backpage's adult ads looked "cleaner than ever."[136]

63.     The Backpage Defendants would not notify the authorities or victim's advocacy

groups when it recognized banned terms in an ad indicating that the individual being sold for sex

was, in fact, a child. The Backpage Defendants would not even block the ads or ban the users

(child sex traffickers). Instead, the Backpage Defendants would intentionally remove the only

shred of evidence indicative of child prostitution and then post the sex ad to backpage.com just to

keep the wheels of its profit machine churning. The Backpage Defendants did this thousands of

times, damning countless children to repeated sexual exploitation, abuse, and rape.

64.     The Backpage Defendants' "moderation practices" were intended and indeed had

the effect of inducing and soliciting users (sex traffickers and sex workers) to post illegal sex

trafficking ads to backpage.com with the knowledge that the illegal content in each sex ad would be developed and refined before posting.   Specifically, the "moderation practices" comprised a service provided by the Backpage Defendants wherein users would supply raw illegal content in the form of explicit sex ads and the Backpage Defendants would develop the ads to mask the illegal nature and make the ad less detectible and prosecutable by law enforcement but nevertheless readily recognizable by viewers (johns) as a sex ad.  In this way, each "moderated" ad that was a collaborative effort between users (sex traffickers and sex workers) and the Backpage Defendants.

65.    During all relevant times, every single ad submitted to the "escort" category of backpage.com was subjected to the automatic filters and/or manual review by "moderators."  The vast majority of which—approximately 80% according to internal backpage.com communications—contained banned terms and images indicative of sex trafficking that were removed by the filters or moderators.  Only 0.5% (5 out of every 1,000) of flagged sex ads—those containing banned terms or images indicative of sex trafficking—were eventually removed from the website.  The remaining 99.5% of illegal ads were simply masked by the Backpage Defendants and posted to backpage.com.

66.    Through these "moderation practices," the Backpage Defendants directly developed and materially contributed to the illegal content of individual sex ads by selectively removing or altering terms and images that would otherwise signal the unlawful nature of a given sex ad.  The illegal sex ad would then be reposted but would, of course, remain what it always was—an illegal sex ad for sex, including sex with children.  Only now the sex ad was enhanced because the explicit illegal nature of the ad was masked, just enough, to prevent law enforcement and/or other third parties from intervening.  Nevertheless, when the Backpage Defendants reposted the masked ad in the "escort" section, it remained readily recognizable to viewers (johns) as an

21

Case 1:20-cv-06734-UA   Document 1-2   Filed 08/21/20   Page 28 of 92

illegal solicitation for sex for money. Thus, the Backpage Defendants' "moderation practices" formed an integral and inseparable part of the illegal sex ads appearing on backpage.com.

67. The Backpage Defendants intentionally masked sex ads to protect themselves, users (sex traffickers and sex workers), and viewers (johns) from detection and resultant criminal and/or civil liability.

68. This combination of targeted policies and practices had the intended effect for more than a decade—the Backpage Defendants reaped hundreds of millions of dollars in profits from ads that they knew involved sex trafficking, prostitution, and even child prostitution.

**D.** **The United States Senate Investigation of Backpage**

69. In January 2017, the United States Senate Permanent Subcommittee on Investigations issued a 50-page report titled "Backpage's Knowing Facilitation of Child Sex Trafficking" (attached here to as **Appendix A,** referred to as the "Senate Report").

70. The Senate Report was the product of an extensive government investigation in which the Backpage Defendants were forced to turn over voluminous quantities of never-before-seen evidence in response to Congressional subpoenas (much of this evidence is included in the 840-page Appendix to the Senate Report).

71. As detailed in the Senate Report, the unearthed evidence confirmed, among other things, that (1) Backpage has actively promoted sex trafficking for over a decade, including trafficking of children, by sanitizing "escort" ads and instructing users how to write prostitution ads that will avoid the scrutiny of law enforcement; and (2) Backpage knowingly concealed evidence of criminality by systematically removing sex trafficking terms from the website's "escort" ads to conceal the true nature of the underlying transaction, and then posting the sanitized ads for a profit.

Case 1:20-cv-06734-UA   Document 1-2   Filed 08/21/20   Page 29 of 92

E.    **Backpage.com's CEO and Top Executives Plead Guilty to Criminal Charges**

72.    In April 2018, Backpage's co-founders Defendants Carl Ferrer, James Larkin and Michael Lacey, among other Backpage executives, were arrested and charged with federal crimes for facilitating prostitution, criminal conspiracy, and money laundering in relation to the backpage.com website.

73.    Shortly thereafter, Backpage's CEO, Carl Ferrer, pled guilty, individually and on behalf of several Backpage corporate entities, to federal and state crimes of human sex trafficking, facilitating prostitution, criminal conspiracy, and money laundering.    Ferrer's factual admissions are spelled-out in his guilty plea:

> In 2004, I co-founded the website www.Backpage.com ("Backpage"), along with M.L. [Michael Lacey] and J.L. [James Larkin].  Backpage eventually became the second-largest classified advertising website in the world, during its 14 years of existence, has derived the great majority of its revenue from fees charged in return for publishing advertisements for 'adult' and 'escort' services.
>
> I have long been aware that the great majority of these advertisements are, in fact, advertisements for prostitution services (which are not protected by the First Amendment and which are illegal in 49 states and in much of Nevada).  Acting with this knowledge, I conspired with other Backpage principals (including but not limited to M.L., J.L., S.S., D.H., A.P., and J.V.) to find ways to knowingly facilitate state-law prostitution crimes being committed by Backpage customers.  For example, I worked with my co-conspirators to create 'moderation' processes through which Backpage would remove terms and pictures that were particularly indicative of prostitution and then publish a revised version of the ad.  Such editing did not, of course, change the essential nature of the illegal service being offered in the ad—it was merely intended to create a veneer of deniability for Backpage.  These editing practices were one component of an overall, company-wide culture and policy of concealing and refusing to officially acknowledge the true nature of the services being offered in Backpage's 'escort' and 'adult' ads.

74.    Defendant Ferrer also admitted that "Since 2004, Backpage has earned hundreds of millions of dollars in revenues from publishing 'escort' and 'adult' ads."

75.     Pursuant to the plea agreement, Ferrer forfeited immediate ownership and control of the backpage.com website and related assets to federal authorities, which promptly and permanently shut down the website.

76.     On August 17, 2018, another Backpage executive, its Sales Director, Dan Hyer, pled guilty to the charge of conspiracy to facilitate prostitution.   Hyer's guilty plea admits the following facts:

> In 1998, I started working at the Dallas Observer, an alternative newspaper that later became part of the Village Voice Media Holdings ("VVMH") chain.   During my early years at the Dallas Observer, I was an account executive responsible for selling print ads.

> In 2006 or 2007, I was asked to help grow Backpage.com ("Backpage"), which was VVMH's attempt to create a classified advertising website to compete with Craigslist.   During my first few years in this position, my primary responsibility was to increase the number of ads being posted on Backpage.   To do so, I helped develop a process called "preboarding" or "aggregation." In general, this process consisted of identifying so-called "escort" and "adult" ads on other websites and creating ads on Backpage for the individuals depicted in those ads in the hope of securing their future business.   These aggregation efforts, which I discussed with my bosses Carl Ferrer and Scott Spear, resulted in large revenue and traffic growth for Backpage.   As a result, Ferrer and Spear authorized the expansion of the aggregation team I was supervising and authorized me to repeat the aggregation process (which was initially concentrated in Dallas) in other major U.S. markets.

> I knew that the majority of the ads that I and others at Backpage were creating through the aggregation process were actually offering illegal prostitution services. Among other things, the true nature of the ads was obvious and we sometimes used ads containing links to The Erotic Review (a website where customers would post "reviews" of their encounters with prostitutes, including descriptions of prices charged for particular sex acts) as the source of the content for the new Backpage ads we were creating.   In addition, I and other Backpage employees were deluged with near-constant reminders—in the form of news articles discussing prostitution busts on Backpage, warning letters from Attorneys General, and other sources—of the reality of what was being offered.   For a period of time, I even received daily "Google alerts" that summarized the new prostitution-related stories about Backpage that kept appearing in the news.   Nevertheless, I kept working for Backpage, and kept facilitating these prostitution offenses, because I was afraid of losing my job and because VVMH and Backpage operated in a culture of denial. I also participated in later efforts to expand Backpage's aggregation efforts to

24

overseas markets, where we often did not even bother with taking out code words to conceal the fact that prostitution services were being offered.

Over time, I also became involved (along with Ferrer, Andrew Padilla, and Joye Vaught) in Backpage's efforts to "moderate" the content of the website's escort and adult ads. Once again, I knew that the majority of the ads being "moderated" were actually offering illegal prostitution services—our removal of explicit words and pictures did nothing to change the underlying nature of the services being offered. In fact, Padilla and I agreed that I and other Backpage sales and marketing employees use the term "models" in intra-company emails when referring to persons in Backpage ads who appeared to be underage. The use of this term was to avoid looking bad in a lawsuit.

77.     Hyer's guilty plea not only reinforces Ferrer's factual admissions—mainly, that Backpage "developed" sex ads by intentionally removing terms and images indicative of each ads illegal nature—it also reveals that Backpage literally "created" sex ads through its "preboarding" and "aggregation" process.

## F.     Allegations Specific to Plaintiff Melanie Thompson

78.     Plaintiff Melanie Thompson was approximately 12 years old when she first came under the control of her traffickers and was advertised for sex in the "Escorts" section of backpage.com.

79.     Advertisements selling Melanie for sex appeared on backpage.com when she was a minor from approximately 2009 to 2016 in New York County, New York, among other locations.

80.     Melanie's sex ads depicted her in a sexually explicit manner and, upon information and belief, contained terms indicating that she was a minor and/or was being sold for sex.

81.     The Backpage Defendants agreed to provide Melanie's traffickers access to its online sex trafficking platform in exchange for a monetary fee. The Backpage Defendants were aware of the traffickers' intent to sexually exploit Melanie by selling her for sex on the backpage.com website and furthered this illicit scheme by providing access to is website, which enabled the traffickers to sell sex with Melanie to countless numbers of men (johns), and providing

Case 1:20-cv-06734-UA    Document 1-2    Filed 08/21/20    Page 32 of 92

instructions to her traffickers to help them maximize profits through use of the website and to disguise indicators of criminality in the advertisements.

82.     In addition, in exchange for the fee, the Backpage Defendants developed and materially contributed to the illegal content of Melanie's ads by "moderating" the raw, unmasked ads to remove banned terms and images.  Specifically, in accordance with their "moderation practices," upon information and belief, the Backpage Defendants removed terms and/or images from Melanie's ads indicating that she was a minor and was being sold for sex.  The Backpage Defendants then posted the enhanced, masked version of her ads on backpage.com.

83.     At no point did the Backpage Defendants take any steps to prevent Melanie from being advertised for sex on backpage.com, or to warn her, her parents, or the authorities, despite clear indications in her ads that she was being sold for sex and that she was a minor.

84.     Rather, the Backpage Defendants' "moderation practices" prevented Melanie's ads from being detected by law enforcement or other third parties because terms and/or images indicating she was a minor and was being sold for sex were removed.

85.     The Backpage Defendants knew, or had reason to know, that the trafficker was selling Melanie, along with other women and children for sex on backpage.com.  Nevertheless, the Backpage Defendants made no effort to prevent Melanie's trafficker from continuing to sell women and children for sex on the website, including Melanie.

86.     Instead, because of their deliberate conduct outlined above and below, the Backpage Defendants induced, encouraged, and solicited Melanie's trafficker and others to post sex ads of Melanie on backpage.com.

87.     Neither Melanie nor any parent or legal guardian consented to having her photograph or information appear on backpage.com while she was a minor, and neither Melanie

nor any parent or legal guardian consented to Melanie having sex with the many adults who raped her because of the advertisements on backpage.com while she was a minor.

88.    As a result of being advertised for sex on backpage.com, Melanie was repeatedly raped, sexually abused and exploited by men who purchased her for sex.

89.    As a direct and proximate result of the foregoing misconduct, Melanie has suffered, and continues to suffer, general and special damages.  These damages include, but are not limited to, severe emotional distress, humiliation, mental anguish, physical and mental pain and suffering, a decrease in her ability to enjoy life, past and future medical expenses, attorneys' fees and costs, and other general and special damages, all in an amount to be determined at trial.

## I.    CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## NEGLIGENCE

90.    Plaintiff re-alleges and incorporates by reference all of the allegations contained in the paragraphs above and below.

91.    The Backpage Defendants had a duty of care to operate www.backpage.com in a manner that did not endanger minor children and women, including Plaintiff.

92.    The Backpage Defendants had a duty of care to take reasonable steps to protect the foreseeable victims of the danger created by their acts and omissions, including the danger created by their online marketplace for sex trafficking and their actions in perpetuating that marketplace by helping sex traffickers post their sex ads and shield indicators of criminality.

93.    The Backpage Defendants breached the foregoing duties because they knew, or should have known, that adults working as sex traffickers were using their website to post advertisements of women and children for sex, including such advertisements of Plaintiff, but they took no steps to protect those women and children, including Plaintiff.

27

94. As a direct and proximate result of their wrongful acts and omissions, Plaintiff suffered, and continue to suffer, general and special damages. These damages include, but are not limited to, emotional distress, humiliation, mental anguish, physical and mental pain and suffering, a decrease in their ability to enjoy life, past and future medical expenses, attorneys' fees and costs, and other general and special damages, all in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

95. Plaintiff re-alleges and incorporates by reference all of the allegations contained in the paragraphs above and below.

96. The Backpage Defendants engaged in extreme and outrageous conduct by knowingly allowing sex traffickers to advertise women and children for sex on their website, including Plaintiff, and by assisting sex traffickers in creating and developing the content of those ads.

97. As a result of this extreme and outrageous conduct, many, many men used www.backpage.com to gain access to Plaintiff and sexually abuse her.

98. The Backpage Defendants knew that this extreme and outrageous conduct would inflict severe emotional and psychological distress on others, including Plaintiff, and Plaintiff did in fact suffer severe emotional and psychological distress as a result. Their emotional damages include severe mental anguish, humiliation and emotional and physical distress.

99. As a direct and proximate result of the foregoing misconduct, Plaintiff suffered, and continue to suffer, general and special damages. These damages include, but are not limited to, severe emotional distress, humiliation, mental anguish, physical and mental pain and suffering,

a decrease in their ability to enjoy life, past and future medical expenses, attorneys' fees and costs, and other general and special damages, all in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

## UNJUST ENRICHMENT

100.    Plaintiff re-alleges and incorporates by reference all of the allegations contained in the paragraphs above and below.

101.    As a result of their wrongful sexual and financial exploitation of Plaintiff, the defendants unjustly profited and enriched themselves at the expense of Plaintiff, including the money some of the defendants received for the sexual services performed by Plaintiff, and the money the Backpage Defendants received for the sex advertisements of Plaintiff on www.backpage.com.

102.    These benefits were conferred onto the defendants with their knowledge of them, and the defendants accepted and retained those benefits under circumstances that make it inequitable for them to retain them without paying their value.

103.    As a direct and proximate result of the foregoing misconduct, Plaintiff suffered, and continue to suffer, general and special damages.  These damages include, but are not limited to, severe emotional distress, humiliation, mental anguish, physical and mental pain and suffering, a decrease in their ability to enjoy life, past and future medical expenses, attorneys' fees and costs, and other general and special damages, all in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

## INVASION OF PRIVACY

104.    Plaintiff re-alleges and incorporates by reference all of the allegations contained in the paragraphs above and below.

105.   The Defendants invaded Plaintiff's right to be let alone.   The Defendants' misconduct includes, but is not limited to, intrusion upon seclusion and public disclosure of private facts.

106.   This is particularly true where the Backpage Defendants knew or should have known that sex traffickers were taking sexually suggestive photographs of women and children, like Plaintiff, and posting those photographs on backpage.com in order to advertise them for sex, and where the Backpage Defendants knew or should have known that those photographs and other private information would necessarily be made public when the Defendants were finally held accountable for their wrongful conduct.

## FIFTH CAUSE OF ACTION

## FAILURE TO WARN

107.   Plaintiff re-alleges and incorporates by reference all of the allegations contained in the paragraphs above and below.

108.   The Backpage Defendants knew of the rampant criminal activity, as described throughout this Complaint, was occurring on the backpage.com website.   The unreasonable risks and perils associated with this rampant criminal conduct were foreseeable to the Backpage Defendants.

109.   The Backpage Defendants were also aware of the unreasonable risk to Plaintiff specifically because they knew, or had reason to know, that Plaintiff was a child being trafficked and sold for sex.

110.   The Backpage Defendants, as the owners and controllers of backpage.com, had a duty to warn invitees, like Plaintiff, of any and all unreasonable and foreseeable risks of harm. This duty including providing general warnings and specific warnings to Plaintiff.

Case 1:20-cv-06734-UA   Document 1-2   Filed 08/21/20   Page 37 of 92

111.    The Backpage Defendants breached the aforementioned duties by failing to take reasonable steps or make efforts to warn Plaintiff, her parents, or the authorities of these risks.

112.    As a direct and proximate result of the Backpage Defendants' breach, Plaintiff suffered, and continues to suffer, general and special damages.  These damages include, but are not limited to, emotional distress, humiliation, mental anguish, physical and mental pain and suffering, a decrease in their ability to enjoy life, past and future medical expenses, attorneys' fees and costs, and other general and special damages, all in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

## CIVIL CONSPIRACY

113.    Plaintiff re-alleges and incorporates by reference all of the allegations contained in the paragraphs above and below.

114.    The Backpage defendants engaged in a common plan or scheme with traffickers, including the men and women who trafficked Plaintiff, to use www.backpage.com to advertise and exploit coerced adults and children for sex, including Plaintiff, and to profit from these illicit transactions.

115.    Based on these actions, the defendants are liable for civil conspiracy.

116.    As a direct and proximate result of the foregoing misconduct, Plaintiff suffered, and continue to suffer, general and special damages.  These damages include, but are not limited to, severe emotional distress, humiliation, mental anguish, physical and mental pain and suffering, a decrease in their ability to enjoy life, past and future medical expenses, attorneys' fees and costs, and other general and special damages, all in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION

## TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT OF 2008, 18

## U.S.C. § 1595

117.    Plaintiff re-alleges and incorporates by reference all of the allegations contained in the paragraphs above and below.

118.    Plaintiff is a victim of sex trafficking within the meaning or 18 U.S.C. § 1591 and are entitled to bring a civil action under 18 U.S.C. § 1595 against any individual or entity whose violations of the TVPRA proximately caused her to sustain physical or psychological injuries.

119.    The Backpage Defendants knowingly participated in illegal sex trafficking ventures, all in violation of the TVPRA.  The Backpage Defendants participated in these ventures by, *inter alia,* engaging in both acts and omissions that were intended to facilitate and aid and abet traffickers' marketing, transportation, and sale of women and children for sex.

120.    Through such acts and omissions, the Backpage Defendants participated in the illegal trafficking ventures that involved Plaintiff and they profited from this participation in that they reaped substantial revenues from the daily advertisements that successfully offered Plaintiff for sale for sex with customers (johns).

121.    Plaintiff is a victim of the unlawful ventures which the Backpage Defendants participated in, promoted, and supported by various means, *inter alia,* (1)  designing their website to increase the incidence and profitability of advertisements reflecting and encouraging the exploitation of children; (2) taking various steps to sustain the impression among traffickers and customers that backpage.com is a safe and effective vehicle for transactions involving women and children, including actions to minimize the risk of detection by law enforcement; (3) implementing various enhancements to its website to increase its effectiveness for traffickers; and (4) failing to

32

investigate or adopt available analytic measures developed by expert academic and technology organizations, and available at little or no cost, that would have enabled the Backpage Defendants to reliably detect advertisements involving exploited women and children, and identify and apprehend the traffickers behind those advertisements.

122.    The Backpage Defendants knew or should have known that Plaintiff was among the women and children being advertised and trafficked on backpage.com, and that the Plaintiff was sold for sex through their website, trafficked in various venues in the region, and raped on many occasions each day in which they were offered for sale.

123.    As a result of the Backpage Defendants' violations of the TVPRA, Plaintiff has suffered substantial physical and psychological injuries, and other damage.

## CPLR 1603 – NO APPORTIONMENT OF LIABILITY

124.    Pursuant to CPLR 1603, the foregoing causes of action are exempt from the operation of CPLR 1601 by reason of one or more of the exemptions provided in CPLR 1602, including but not limited to, CPLR 1602(2), CPLR 1602(5), 1602(7) and 1602(11), thus precluding defendants from limiting their liability by apportioning some portion of liability to any joint tortfeasor.

## PRAYER FOR RELIEF

125.    Plaintiff demands judgment against the defendants named in his causes of action, together with compensatory and punitive damages to be determined at trial, and the interest, cost and disbursements pursuant to their causes of action, and such other and further relief as the Court deems just and proper.

126.   Plaintiff specifically reserves the right to pursue additional causes of action, other than those outlined above, that are supported by the facts pleaded or that may be supported by other facts learned in discovery.

Dated:  January 21, 2020

Respectfully Yours,


MARSH LAW FIRM PLLC


By _____
James R. Marsh
31 Hudson Yards
11th Floor Suite 36
New York, NY 10001
Phone: 929-232-3235
jamesmarsh@marsh.law

Jennifer Freeman
31 Hudson Yards
11th Floor Suite 36
New York, NY 10001
Phone:  206-330-0215
jenniferfreeman@marsh.law

Robert Y. Lewis
31 Hudson Yards
11th Floor Suite 36
New York, NY 10001
Phone: 646-306-2145
robertlewis@marsh.law

PFAU COCHRAN VERTETIS AMALA PLLC

By _____

Michael T. Pfau
403 Columbia St.
Suite 500
Seattle, WA 98104
Phone:  206-462-4335
michael@pcvalaw.com
*Pro hac vice forthcoming*

Jason P. Amala
403 Columbia St.
Suite 500
Seattle, WA 98104
Phone:  206-462-4339
jason@pcvalaw.com
*Pro hac vice forthcoming*

Vincent T. Nappo
403 Columbia St.
Suite 500
Seattle, WA 98104
Phone:  206-453-0432
vnappo@pcvalaw.com
*Pro hac vice forthcoming*

**Attorneys for Plaintiff**

35



STATE OF NEW YORK
**UNIFIED COURT SYSTEM**
111 CENTRE STREET
NEW YORK, N.Y. 10013
(646) 386-4200

**LAWRENCE K. MARKS**
Chief Administrative Judge

**GEORGE J. SILVER**
Deputy Chief Administrative Judge
New York City Courts

## ADMINISTRATIVE ORDER #371
## AMENDED

By the authority vested in me as Deputy Chief Administrative Judge of the courts within New York City, and as the coordinating judge of all cases filed under the Child Victims Act[1] (the "CVA") within that jurisdiction, I hereby order as follows:

1. This Order applies to all cases filed or hereafter filed in the Supreme Courts in and for the counties of Bronx, Kings, New York, Queens, and Richmond pursuant to the CVA, including any such matters filed before the one-year window commenced on August 14, 2019, and which were then stayed pending the opening of the window on August 14, 2019.

2. While a steering committee negotiates a Case Management Order to address the efficient prosecution and defense of cases filed under the CVA, all Preliminary Conferences currently scheduled or requested as of the effective date of this Order, and any requests for Preliminary Conferences made after the effective date of this Order are adjourned to a control date of January 31, 2020.[2]

3. The time to respond to any discovery demands served by the parties as of the effective date of this Order is adjourned without a date. No demands for discovery shall be served by any party until further Order of this Court.

4. Plaintiffs' time to respond to stipulations and orders that consent to or direct the production of identifying information, consisting of a plaintiff's name (including maiden name, if any), date of birth, social security number, parents and/or guardian's names, current address, and address at the time of the alleged abuse, for plaintiffs proceeding under pseudonyms is extended to December 20, 2019. Plaintiffs shall provide such identifying information to

---

[1] L. 2019 c.11.

[2] Parties may make an application to extend this, and other deadlines, as necessary.

defense counsel in a manner other than disclosure in a public filing on NYSCEF and as agreed to by the parties. Nothing in this Order prevents plaintiffs from voluntarily providing such identifying information at any time.

5. All papers in opposition to any Order to Show Cause or Notice of Motion, including motions to dismiss under CPLR §3211 or §3212, but excluding motions to proceed anonymously or by pseudonym, are adjourned until January 31, 2020. Should the motion(s) not be resolved and withdrawn by the parties as of that date, the Court will set any additional due dates as necessary. No motions, other than motions to proceed anonymously or by pseudonym, shall be filed prior to January 31, 2020 without permission of the Court. As such, no motions to dismiss under CPLR §3211 or §3212 shall be filed prior to January 31, 2020.

6. The time to answer, move against, or otherwise respond to any complaint that has been served as of the effective date of this Order is extended until further Order of the Court. This Order supersedes any due dates for answers or motions previously stipulated to by the parties and/or ordered by this Court.

7. The time to answer, move against, or otherwise respond to any complaint that is served after the effective date of this Order, but prior to January 31, 2020, shall be extended until a date stipulated to by the parties or as directed by further Order of the Court.

8. Notwithstanding any stipulation or Court Order to the contrary, no motion to sever shall be filed prior to January 31, 2020. Consistent with the CPLR, motions to sever may be filed after January 31, 2020.

9. Counsel shall make a good faith effort to resolve any motions to dismiss or motions to sever prior to filing such motions.


Dated: December 11, 2019


_____
Hon. George J. Silver
Deputy Chief Administrative Judge
New York City Courts



STATE OF NEW YORK
**UNIFIED COURT SYSTEM**
111 CENTRE STREET
NEW YORK, N.Y. 10013
(646) 386-4200

**LAWRENCE K. MARKS**
Chief Administrative Judge

**GEORGE J. SILVER**
Deputy Chief Administrative Judge
New York City Courts

## ADMINISTRATIVE ORDER #40

By the authority vested in me as Deputy Chief Administrative Judge of the courts within New York City, and as the coordinating judge of all cases filed under the Child Victims Act (the "CVA") within that jurisdiction, I hereby order as follows:

1. Following consultation with a steering committee that continues to negotiate a Case Management Order to address the efficient prosecution and defense of cases filed under the CVA, the adjournment of all CVA matters is extended to a control date of Tuesday, February 11, 2020.

2. Administrative Order #371 remains in effect until February 11, 2020.

3. The steering committee will assemble for a meeting on February 11, 2020 at 2:00 PM.

Dated: February 4, 2020

_Geroge J. Silver_
_____
Hon. George J. Silver
Deputy Chief Administrative Judge
New York City Courts

SUPREME COURT OF THE STATE OF NEW YORK
COUNTIES OF BRONX, KINGS, NEW YORK, QUEENS AND RICHMOND

---

In re: CHILD VICTIMS ACT NYC LITIGATION          CASE MANAGEMENT
                                                 ORDER No. 1

---

## I.     Applicability of Order.

1.     This Case Management Order ("CMO") applies to all actions filed or hereafter filed in the Supreme Courts in and for the counties of Bronx, Kings, New York, Queens, and Richmond pursuant to the Child Victims Act (the "CVA Actions"), including any such matters filed before the one-year window commenced on August 14, 2019, and which were then stayed pending the opening of the window on August 14, 2019.

2.     This CMO applies to all pre-trial procedures and proceedings in the CVA Actions, except as otherwise directed by the Court upon good cause shown by the party seeking such relief.

## II.    Rules of Procedure.

1.     The Civil Practice Law and Rules, the Uniform Civil Rules for Supreme and County Courts together with the express provisions of this CMO and further orders issued by this Court, shall govern all pre-trial proceedings.

## III.   Anonymity.

1.     If consented to by all defendants to an action, a plaintiff may initiate an action and file a complaint by initials or pseudonym, rather than the person's legal name, and proceed on the Court's public docket by initials or pseudonym. If all defendants do not consent, then, together with the filing of the complaint, a plaintiff must file an application by order to show cause seeking permission to proceed by initials or pseudonym.

2.     If a defendant consents to anonymity, it retains all rights to conduct full discovery, investigate, and otherwise prepare its defenses that would exist in the absence of this order, including without limitation the right to disclose a plaintiff's legal name and information described below in paragraph III.3 (including to its insurers and agencies) in providing notice of the claim and seeking and obtaining discovery and information from third parties and in providing information to any expert witnesses or consultant, so long as such persons provided with this information agree to

maintain the confidentiality of the information and be subject to the Confidentiality Order discussed at paragraph IX.A.1 below.

3.  Within 14 days of receiving an appearance by a defendant in the matter, a plaintiff who files a complaint using initials or a pseudonym must provide to defense counsel or, if the defendant appears *pro se*, the defendant, the plaintiff's name (including maiden name, if any), plaintiff's name at the time of the alleged abuse, date of birth, social security number, parents and/or guardian's names at the time of the alleged abuse, current address, and address at the time of the alleged abuse, if known. A plaintiff's identification information shall be considered Confidential Personal Information only to the extent provided by Section 202.5(e) of the Uniform Civil Rule of the Supreme Court and shall be omitted or redacted in any filings on the Court's public docket. The filing party shall serve unredacted copies of any such filings on all parties to the action.

4.  The Court's authorization for a plaintiff to proceed on the docket by initials or pseudonym is the result of party agreement or Court Order. The Court's Order permitting such agreement is not intended to reflect any modification to existing law on the issue.

## IV.    Conferences.

1.  The Court shall hold a General Status Conference on the first Tuesday of each month at 2:00 p.m. at 111 Centre Street, Courtroom 1227, unless otherwise designated by the Court.

2.  The Plaintiffs' Liaison Committee ("PLC") and Defendants' Liaison Committee ("DLC") (collectively, "Liaison Committees") shall confer as necessary ten business days prior to each General Status Conference and provide an agenda of items to the Court no later than 3:00 p.m. three business days prior to a General Status Conference. The PLC and DLC may, but are not required to, file separate letter submissions with the Court of no more than 3 pages in connection with *each* agenda item, *i.e.* a liaison committee may file multiple letter submissions depending on the number of agenda items. Any letter submissions must be filed three business days prior to a scheduled conference.

3.  Immediately following the General Status Conference, the Court will conduct conferences in individual CVA Actions to address case-specific matters as necessary. Parties wishing to raise an issue in any individual action to the Court shall file a letter not exceeding three pages in the applicable individual action no later than 3:00 p.m. seven business days prior to the General Status Conference. The opposing party may file a letter response not exceeding three pages in the same action no later than 3:00 p.m. three business days prior to the General Status Conference.

2

Letters filed with the Court pursuant to this paragraph shall be emailed to each Liaison Committee at the time of filing at the email addresses set forth in section XI.

4. Working copies of the letter submissions described in this section shall be delivered to chambers.

5. Nothing in this Order forecloses a party from seeking relief by appropriate motion.

## V.   Individual Actions.

1. The parties may meet and confer on any CVA Action that has been filed by, or on behalf of, multiple plaintiffs as of the date of this Order to discuss the severance, without prejudice, into new and independent individual actions for each plaintiff.

2. If the parties agree to the severance, the parties may enter into a stipulation reflecting such agreement, and each severed plaintiff will file a new action (using the same pleading) under a separate index number. Each re-filed complaint shall be deemed filed as of the date the initial action was filed. If the Complaint has previously been served, each re-filed action may be served pursuant to CPLR §2103(b). Each individual action shall be assigned to the Hon. George J. Silver, Deputy Chief Administrative Judge for the New York City Courts, for all pretrial matters.

3. If the parties cannot resolve the issue of severance after a good faith attempt to do so, a motion may be filed with the Court seeking to sever the action into new and independent individual actions.

4. Any previous orders regarding proceeding on the docket by pseudonym or initials entered in an action shall be deemed to have been made in each severed individual action.

## VI.   Coordinated Motion Practice.

1. To conserve resources and avoid burdening the Court with duplicative motion practice, the parties in separate actions may stipulate to address issues common to multiple CVA Actions through a coordinated motion, *i.e.*, one set of opening motion papers, one set of opposition papers, if any, and one set of reply papers, if any. The coordinated motion practice set forth herein may proceed only as stipulated between the parties to such stipulation. The parties may file motion papers in multiple actions under this section. By way of example, the parties may stipulate to filing one motion under CPLR §3211 or CPLR §3212 in multiple cases brought by the same plaintiff's counsel.

3

2.  Counsel shall make a good faith effort to resolve any coordinated motions to dismiss prior to filing, including by taking into consideration decisions that have been rendered by the Court and the existing body of law.

3.  Counsel shall provide courtesy copies of all papers related to coordinated motions to each Liaison Committee by email to the email addresses set forth in section XI within three days of filing or service.

## VII.  Procedures for Responses to Complaints.

1.  The time to answer, move against, or otherwise respond to any complaint or amended complaint that was served upon the responding defendant between August 14, 2019 through and including October 14, 2019, is extended until 35-days from the effective date of this Order.

2.  The time to answer, move against, or otherwise respond to any complaint or amended complaint that was served upon the responding defendant between October 15, 2019 through and including December 11, 2019, is extended until 45-days from the effective date of this Order.

3.  The time to answer, move against, or otherwise respond to any complaint or amended complaint that was served upon the responding defendant between December 12, 2019 through and including February 11, 2020, is extended until 55-days from the effective date of this Order.

4.  The time to answer, move against, or otherwise respond to any complaint or amended complaint that was served upon the responding defendant on February 12, 2020 and later shall be 60-days from the date of service upon the responding defendant.

5.  In matters filed solely against individual defendants with no corporate or municipal or institutional defendants, the time to answer, move against, or otherwise respond to any complaint or amended complaint that was served upon the individual defendant prior to December 12, 2019, is extended 25-days from the effective date of this Order.

6.  In matters filed solely against individual defendants with no corporate or municipal or institutional defendants, the time to answer, move against, or otherwise respond to any complaint or amended complaint that was served upon the individual defendant between December 12, 2019 through and including February 11, 2020, is extended 30-days from the effective date of this Order.

7.  In matters filed solely against individual defendants with no corporate or municipal or institutional defendants, the time to answer, move against, or otherwise respond to any complaint or amended complaint that was served upon the individual defendant on February 12, 2020 and later shall be 30-days from the date of service upon the individual defendant.

4

8.      Where a complaint or amended complaint is re-filed pursuant to a stipulation consenting to or an Order of this Court directing the severance of a CVA Action that was originally filed as a multi-plaintiff CVA Action before the effective date of this Order, the time to answer, move against, or otherwise respond to such re-filed complaint or amended complaint shall be 45-days from the date the complaint is refiled.

9.      The deadlines set forth in this section supersede any deadlines for answering or otherwise responding to a complaint or amended complaint that were previously stipulated by the parties or ordered by this Court.

10.      Absent agreement by the parties or Order of this Court, no motion to dismiss shall stay discovery unless the moving party seeks to dismiss the complaint in its entirety. In the event that a party moves to dismiss the complaint in its entirety, discovery shall be stayed only as to that moving defendant and shall proceed as against the remaining defendants.

## VIII.   Procedures for Responses to Pending Motions.

1.      The time to serve opposition papers to any Order to Show Cause or Notice of Motion, including motions to dismiss under CPLR §§3211 or 3212, but excluding motions to proceed anonymously or by pseudonym, that were filed and served prior to Administrative Order #40 dated February 4, 2020, is extended to 30-days from the effective date of this Order.

2.      Should the motion(s) not be resolved and withdrawn by the parties as of the date proscribed by paragraph 1 of this section, the Court will set any additional due dates as necessary for reply papers, return date, and oral argument.

3.      The deadlines set forth in this section supersede any deadlines for the service of opposition papers and the filing of working copies of motion papers that were previously stipulated by the parties or ordered by this Court.

## IX.   Disclosure.

A.      Confidentiality Order.

1.      Within 21 days of the effective date of this Order, Plaintiffs' and Defendants' Liaison Counsel shall jointly submit a proposed Confidentiality Order (or alternate proposals) that will apply to disclosure in all CVA Actions. No disclosure (other than disclosure of plaintiffs' identifying information pursuant to section III.3 above) in any CVA Action may take place prior to entry by the Court of a Confidentiality Order.

5

B.     Disclosure Requests.

1.     Plaintiffs shall serve responses and/or objections to Standard Automatic Disclosures and Common Demand for Verified Bill of Particulars in an individual action upon the answering defendant no later than 30 days from defendant filing an answer, motion or other response to the complaint or amended complaint, except as provided in section VII.10.

2.     Each defendant shall serve responses and/or objections to Standard Automatic Disclosures in each individual action no later than 30 days after receiving plaintiff's responses and objections described above in paragraph IX.B.1.

3.     Each plaintiff and defendant shall serve responses and/or objections to Standard Combined Demands/Notices to Produce no later than 40 days after service of the responding defendant's responses and/or objections described above in paragraph IX.B.2.

4.     Unless otherwise agreed by the parties to a CVA Action, responses and/or objections to any disclosure demands are to be served by U.S. Mail or its equivalent, and/or by email where agreed to by the parties, and will not be e-filed by any party on the Court's docket. However, subject to the Court's forthcoming Confidentiality Order, excerpts of such responses may be e-filed if they are pertinent exhibits to a motion, *e.g.* in a motion to compel.

5.     Any party may serve supplemental, non-repetitive disclosure requests in accordance with the CPLR and applicable discovery submission schedule for that action. Counsel shall exercise good faith, in determining the need for such further requests.

6.     None of the requests attached to this Order shall be construed to be interrogatories for purposes of CPLR §3130. No party may avoid sitting for a deposition by reason of responding to the discovery requests contained in this Order.

7.     To the extent a defendant has filed an answer before the effective date of this Order, the time for a plaintiff to serve responses and/or objections to Standard Automatic Disclosures and Common Demand for Verified Bill of Particulars shall be 50 days from the effective date of this Order. All other discovery deadlines shall follow the provisions of this section as set forth herein.

C.     Standard Plaintiff Disclosures and Authorizations.

1.     Standard Automatic Disclosures directed at Plaintiffs shall be provided to the Court and shall become Exhibit A to this Order.

6

2. Common Demand for Verified Bill of Particulars directed at Plaintiffs shall be provided to the Court and shall become Exhibit B to this Order.

3. Standard Automatic Disclosures directed at Defendants shall be provided to the Court and shall become Exhibit C to this Order.

4. Standard Combined Demands directed at Plaintiffs shall be provided to the Court and shall become Exhibit D to this Order.

5. Standard Combined Demands directed at Defendants shall be provided to the Court and shall become Exhibit E to this Order.

6. All disclosure requests listed in this section are deemed served as of the date of the response to the complaint.

## X.   Stay of Actions for Settlement Discussions.

1. If the parties to any CVA Action wish to discuss settlement without litigating the action simultaneously, the parties may jointly notify the Court by letter of their intention to do so. The parties' notification shall automatically adjourn all case deadlines (e.g., discovery, motion practice, etc.) by 45 days from the date of the parties' letter notification. The parties' letter notification shall set forth an amended schedule for any court deadlines reflecting this adjournment. Upon further agreement by the parties, the amended schedule shall be automatically effective for the action without further order of the Court for a maximum of two 45-day adjournments for a total of 90 days. Any further adjournments must be so-ordered by the Court.

## XI.   Cooperation.

1. The Court recognizes that cooperation among counsel and parties is essential for the orderly and expeditious resolution of this litigation. The communication of information among the plaintiffs' counsel, among defendants' counsel, and among defendants or other necessary participants shall not be deemed a waiver of the attorney-client privilege, the protection afforded by the attorney work-product doctrine, or any other privilege to which a party may be entitled. Any cooperative efforts described above shall not, in any way, be used against any of the parties and shall not be communicated to the jury.

2. In the interests of justice and cooperation, the parties may stipulate to a two-week extension of any of the deadlines set forth in this Order without further Order of this Court.

3. Any counsel or party who needs to communicate with Plaintiffs' Liaison Counsel, including any notice or communication required by this CMO or future order of this Court, shall email nycplc@cvaplaintiffs.com. The

7

members of this email address shall be limited to Plaintiffs' Liaison Counsel, their staff, and their associates or co-counsel.

4.     If the Court needs to communicate with Plaintiffs' Liaison Counsel the Court will email nycplc@cvaplaintiffs.com.

5.     All plaintiff's counsel must subscribe to nycplc@cvaplaintiffs.com in order to receive communications from Plaintiffs' Liaison Counsel, including any notice or communication required by this CMO or future order of this Court. The members of this email address shall be limited to plaintiff's counsel, their staff, their associates, and their co-counsel.

6.     Any counsel who needs to communicate with Defendants' Liaison Counsel, including any notice or communication required by this CMO or future order of this Court, shall email cvasteering@defendantliaison.com. The members of this email address shall be limited to Defendants' Liaison Counsel, their staff, and their associates or co-counsel.

7.     If the Court needs to communicate with Defendants' Liaison Counsel the Court will email cvasteering@defendantliaison.com.

## XII.   Effective Date and Future Orders

1.     The effective date of this Order shall be the date it is uploaded to the Court's Docket on NYSCEF.

     a.     The disclosure requests contemplated by this Order and identified as Exhibits A through E at section IX.C.1-5 will be uploaded to the Court's Docket on NYSCEF.

2.     Any pre-trial discovery procedures and proceedings not addressed by this Order, such as depositions, may be addressed in future Orders of this Court.

Dated: February 24, 2020

_George J. Silver_

**HON. GEORGE J. SILVER**

8



STATE OF NEW YORK
**UNIFIED COURT SYSTEM**
111 CENTRE STREET
NEW YORK, N.Y. 10013
(646) 386-4200

**LAWRENCE K. MARKS**
Chief Administrative Judge

**GEORGE J. SILVER**
Deputy Chief Administrative Judge
New York City Courts

# ADMINISTRATIVE ORDER #371
## AMENDED

By the authority vested in me as Deputy Chief Administrative Judge of the courts within New York City, and as the coordinating judge of all cases filed under the Child Victims Act[1] (the "CVA") within that jurisdiction, I hereby order as follows:

1. This Order applies to all cases filed or hereafter filed in the Supreme Courts in and for the counties of Bronx, Kings, New York, Queens, and Richmond pursuant to the CVA, including any such matters filed before the one-year window commenced on August 14, 2019, and which were then stayed pending the opening of the window on August 14, 2019.

2. While a steering committee negotiates a Case Management Order to address the efficient prosecution and defense of cases filed under the CVA, all Preliminary Conferences currently scheduled or requested as of the effective date of this Order, and any requests for Preliminary Conferences made after the effective date of this Order are adjourned to a control date of January 31, 2020.[2]

3. The time to respond to any discovery demands served by the parties as of the effective date of this Order is adjourned without a date. No demands for discovery shall be served by any party until further Order of this Court.

4. Plaintiffs' time to respond to stipulations and orders that consent to or direct the production of identifying information, consisting of a plaintiff's name (including maiden name, if any), date of birth, social security number, parents and/or guardian's names, current address, and address at the time of the alleged abuse, for plaintiffs proceeding under pseudonyms is extended to December 20, 2019. Plaintiffs shall provide such identifying information to

---

[1] L. 2019 c.11.

[2] Parties may make an application to extend this, and other deadlines, as necessary.

defense counsel in a manner other than disclosure in a public filing on NYSCEF and as agreed to by the parties. Nothing in this Order prevents plaintiffs from voluntarily providing such identifying information at any time.

5. All papers in opposition to any Order to Show Cause or Notice of Motion, including motions to dismiss under CPLR §3211 or §3212, but excluding motions to proceed anonymously or by pseudonym, are adjourned until January 31, 2020. Should the motion(s) not be resolved and withdrawn by the parties as of that date, the Court will set any additional due dates as necessary. No motions, other than motions to proceed anonymously or by pseudonym, shall be filed prior to January 31, 2020 without permission of the Court. As such, no motions to dismiss under CPLR §3211 or §3212 shall be filed prior to January 31, 2020.

6. The time to answer, move against, or otherwise respond to any complaint that has been served as of the effective date of this Order is extended until further Order of the Court. This Order supersedes any due dates for answers or motions previously stipulated to by the parties and/or ordered by this Court.

7. The time to answer, move against, or otherwise respond to any complaint that is served after the effective date of this Order, but prior to January 31, 2020, shall be extended until a date stipulated to by the parties or as directed by further Order of the Court.

8. Notwithstanding any stipulation or Court Order to the contrary, no motion to sever shall be filed prior to January 31, 2020. Consistent with the CPLR, motions to sever may be filed after January 31, 2020.

9. Counsel shall make a good faith effort to resolve any motions to dismiss or motions to sever prior to filing such motions.

Dated: December 11, 2019

_____
Hon. George J. Silver
Deputy Chief Administrative Judge
New York City Courts

## AFFIDAVIT OF SERVICE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

--------------------------------------------------------------------------------Index No. 950015/2020

MELANIE THOMPSON,

Plaintiff(s),

-vs-

BACKPAGE.COM, L.L.C., ET AL.

Defendant(s).

--------------------------------------------------------------------------------X

I, Frank Joyce, State of Delaware, County of New Castle, being duly sworn, says that on the 9th day of March, 2020 at 10:40 a.m., I personally served a copy of a Summons, Complaint, Administrative Order #371, Notice of Mandatory Electronic Filing, and Confirmation of Filing Notice on the defendant, **CAMARILLO HOLDINGS, LLC,** by serving the registered agent, Delaware Corporations LLC, . 1000 N. West St. Suite 1501 Wilmington, DE 19801.

Name of individual accepting service: Kimberly Bossard – authorized to accept.
Description of individual: Caucasian female, 45-50 yrs. old, 150 lbs., 5'5" with blonde hair.

Subscribed and sworn before me
This 9th day of March, 2020

Notary Public

My commission expires: _____

### AFFIDAVIT OF SERVICE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------------Index No. 950015/2020

MELANIE THOMPSON,

Plaintiff(s),

-vs-

BACKPAGE.COM, L.L.C., ET AL.

Defendant(s).

------------------------------------------------------------------------X

I, Frank Joyce, State of Delaware, County of New Castle, being duly sworn, says that on the 9th day of March, 2020 at 10:40 a.m., I personally served a copy of a Summons, Complaint, Administrative Order #371, Notice of Mandatory Electronic Filing, and Confirmation of Filing Notice on the defendant, **LEEWARD HOLDINGS, LLC,** by serving the registered agent, Delaware Corporations LLC, . 1000 N. West St. Suite 1501 Wilmington, DE 19801.

Name of individual accepting service: Kimberly Bossard -- authorized to accept. Description of individual: Caucasian female, 45-50 yrs. old, 150 lbs., 5'5" with blonde hair.

Subscribed and sworn before me
This 9th day of March, 2020

Notary Public

My commission expires: _____

## AFFIDAVIT OF SERVICE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------------Index No. 950015/2020

MELANIE THOMPSON,

Plaintiff(s),

-vs-

BACKPAGE.COM, L.L.C., ET AL.

Defendant(s).

-------------------------------------------------------------------------X

I, Frank Joyce, State of Delaware, County of New Castle, being duly sworn, says that on
the 9th day of March, 2020 at 10:40 a.m., I personally served a copy of a Summons,
Complaint, Administrative Order #371, Notice of Mandatory Electronic Filing, and
Confirmation of Filing Notice on the defendant, **MEDALIST HOLDINGS, LLC,** by
serving the registered agent, Delaware Corporations LLC, . 1000 N. West St. Suite 1501
Wilmington, DE 19801.

Name of individual accepting service: Kimberly Bossard – authorized to accept.
Description of individual: Caucasian female, 45-50 yrs. old, 150 lbs., 5'5" with blonde
hair.

Subscribed and sworn before me
This 9th day of March, 2020

_____
Notary Public

My commission expires: _____

ZAHID HOSSAIN NAWAZ
COMMISSION EXPIRES
SEPT. 10, 2020
NOTARY PUBLIC
STATE OF DELAWARE

| Client# | | NHI ID: |
|---|---|---|
| 999 | # NightHawk Investigations, Inc. | 2,126,507 |

INVESTIGATION * TRIAL PREPARATION * SURVEILLANCE
Phn (972) 222-HAWK    Fax (972) 222-9940

## AFFIDAVIT OF PROCESS SERVER

Person or Entity that was served:

| | | Employer |
|---|---|---|
| Subject: | CF HOLDINGS GP LLC BY SERVING CARL A FERRER | |
| Add1 | 2531 TUMBLEWEED WAY | Add2 7409 KINGSBARNS | |
| | FRISCO    TX  75034 | THE COLONY    TX  75056 | |
| Client Info: | PCVA LAW | Phn: 206-462-4337 |
| Attn: | JACK KENNEDY | Fax: 206-623-3624 |
| | 403 COLUMBIA ST STE 500 | |
| | SEATTLE    WA  98104 | |

**COURT:** *NEW YORK STATE SUPREME COURT, NEW YORK COUNTY*

**DOCKET:** *950015/2020*

**CASE NAME:** *MELANIE THOMPSON VS. BACKPAGE.COM LLC, ET AL*

**DOCUMENTS:**
*SUMMONS; COMPLAINT; ADMINISTRATIVE ORDER #371; NOTICE OF MANDATORY ELECTRONIC FILING; CONFIRMATION OF FILING NOTICE*

### Service Attempts:  Please Document Date, Time, Disposition:

3/11/2020 6:35PM ES:  I, EMILIE SMYTHE, PERSONALLY SERVED CF HOLDINGS GP LLC BY SERVING CARL A FERRER AT RAISING CANE'S LOCATED AT 5688 FM-423 N, FRISCO, DENTON COUNTY, TX 75034.

3/11/2020 6:27PM ES:  RECEIVED A CALL FROM THE SUBJECT AT 602-206-9506 STATING THAT HE WOULD BE AVAILABLE TO MEET WITH ME AT RAISING CANE'S LOCATED AT 5688 FM-423 N, FRISCO, TX 75034 IN ABOUT 10 MINUTES.

3/11/2020 6:18PM ES:  ATTEMPTED TO SERVE CF HOLDINGS GP LLC BY SERVING CARL A FERRER AT 7409 KINGSBARNS, THE COLONY, TX 75056. A FEMALE RESIDENT ANSWERED THE DOOR AND IDENTIFIED HERSELF AS THE SUBJECT'S EX-WIFE. SHE STATED THAT HE DOES NOT LIVE HERE AT TH ADDRESS. CALLED 602-206-9506 AND NO ONE ANSWERED. LEFT VOICEMAIL.

3/10/2020 3:00PM ES:  DOCUMENTS RECEIVED.

AUTHORIZED BY:
TEXAS SUPREME COURT
ID#: PSC 18281  EXP: 3/31/22
NIGHTHAWK INVESTIGATIONS, INC.

### Manner of Service:

- ● Personal:  By personally delivering documents to the person or entity being served.
- ○ Substitute at Residence:  By leaving documents at the home of the person being served with a member over 18 years old.
- ○ Substitute at Business:  By leaving documents at the office during normal business hours with the person apparently in charge thereof.
- ○ Posting:  By posting documents in a conspicuous manner to the front door or gate of the person or entity being served.
- ○ Non Service:  After diligent attempts to serve documents, I have been unable to effect process upon the person or entity being served.

I, _____Emilie Smythe_____, being first duly sworn, depose and say: that I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to perform said service, and to my personal knowledge, the facts stated in this affidavit are true and correct.

Signed: *Emilie Smythe*                    Date: 3/12/2020

STATE OF TEXAS:
SUBSCRIBED AND SWORN TO, BEFORE ME THIS 12th DAY OF March 2020

*Jamie Smythe*
Notary Public

NightHawk Investigations, Inc.
Post Office Box 1639, Van Alstyne TX 75495

JAMIE SMYTHE
Notary Public, State of Texas
Comm. Expires 08-31-2020
Notary ID 129108455

1 of 1

# NightHawk Investigations, Inc.

INVESTIGATION * TRIAL PREPARATION * SURVEILLANCE

Phn (972) 222-HAWK   Fax (972) 222-9940

Client# 999

NHI ID: 2,126,503

## AFFIDAVIT OF PROCESS SERVER

Person or Entity that was served:

Subject: AMSTEL RIVER HOLDINGS LLC BY SERVING CARL A FERRER

Add1: 2531 TUMBLEWEED WAY   FRISCO   TX   75034

Add2: 7409 KINGSBARNS   THE COLONY   TX   75056

Employer:

Client Info: PCVA LAW
Attn: JACK KENNEDY
403 COLUMBIA ST STE 500
SEATTLE   WA   98104

Phn: 206-462-4337
Fax: 206-623-3624

COURT: NEW YORK STATE SUPREME COURT, NEW YORK COUNTY

DOCKET: 950015/2020

CASE NAME: MELANIE THOMPSON VS. BACKPAGE.COM LLC, ET AL

DOCUMENTS:
SUMMONS; COMPLAINT; ADMINISTRATIVE ORDER #371; NOTICE OF MANDATORY ELECTRONIC FILING; CONFIRMATION OF FILING NOTICE

Service Attempts:  Please Document Date, Time, Disposition:

3/11/2020 6:35PM ES:  I, EMILIE SMYTHE, PERSONALLY SERVED AMSTEL RIVER HOLDINGS LLC BY SERVING CARL A FERRER AT RAISING CANE'S LOCATED AT 5688 FM-423 N, FRISCO, DENTON COUNTY, TX 75034.

3/11/2020 6:27PM ES:  RECEIVED A CALL FROM THE SUBJECT AT 602-206-9506 STATING THAT HE WOULD BE AVAILABLE TO MEET WITH ME AT RAISING CANE'S LOCATED AT 5688 FM-423 N, FRISCO, TX 75034 IN ABOUT 10 MINUTES.

3/11/2020 6:18PM ES:  ATTEMPTED TO SERVE AMSTEL RIVER HOLDINGS LLC BY SERVING CARL A FERRER AT 7409 KINGSBARNS, THE COLONY, TX 75056. A FEMALE RESIDENT ANSWERED THE DOOR AND IDENTIFIED HERSELF AS THE SUBJECT'S EX-WIFE. SHE STATED THAT HE DOES NOT LIVE HERE AT THIS ADDRESS. CALLED 602-206-9506 AND NO ONE ANSWERED. LEFT VOICEMAIL.

3/10/2020 3:00PM ES:  DOCUMENTS RECEIVED.

AUTHORIZED BY:
TEXAS SUPREME COURT
ID#: PSC 18281 EXP: 3/31/22
NIGHTHAWK INVESTIGATIONS, INC.

Manner of Service:

● Personal:  By personally delivering documents to the person or entity being served.
○ Substitute at Residence:  By leaving documents at the home of the person being served with a member over 18 years old.
○ Substitute at Business:  By leaving documents at the office during normal business hours with the person apparently in charge thereof.
○ Posting:  By posting documents in a conspicuous manner to the front door or gate of the person or entity being served.
○ Non Service:  After diligent attempts to serve documents, I have been unable to effect process upon the person or entity being served.

I, Emilie Smythe, being first duly sworn, depose and say: that I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to perform said service, and to my personal knowledge, the facts stated in this affidavit are true and correct.

Signed: Emilie Smythe   Date: 3/12/2020

STATE OF TEXAS:
SUBSCRIBED AND SWORN TO, BEFORE ME THIS 12th DAY OF March 2020

Jamie Smythe
Notary Public

NightHawk Investigations, Inc.
Post Office Box 1639, Van Alstyne TX 75495

JAMIE SMYTHE
Notary Public, State of Texas
Comm. Expires 08-31-2020
Notary ID 129108455

1 of 1

| Client# | | NHI ID: |
|---|---|---|
| 999 | | 2,126,509 |

# NightHawk Investigations, Inc.

INVESTIGATION * TRIAL PREPARATION * SURVEILLANCE

Phn (972) 222-HAWK   Fax (972) 222-9940

## AFFIDAVIT OF PROCESS SERVER

Person or Entity that was served:

| | | Employer |
|---|---|---|
| Subject: | ATLANTISCHE BEDRIJVEN CV BY SERVING CARL A FERRER | |
| Add1 | 2531 TUMBLEWEED WAY | Add2 7409 KINGSBARNS | |
| | FRISCO   TX   75034 | THE COLONY   TX   75056 | |
| Client Info: | PCVA LAW | Phn: 206-462-4337 | |
| Attn: | JACK KENNEDY | Fax: 206-623-3624 | |
| | 403 COLUMBIA ST STE 500 | | |
| | SEATTLE   WA   98104 | | |

**COURT:** NEW YORK STATE SUPREME COURT, NEW YORK COUNTY

**DOCKET:** 950015/2020

**CASE NAME:** MELANIE THOMPSON VS. BACKPAGE.COM LLC, ET AL

**DOCUMENTS:**

SUMMONS; COMPLAINT; ADMINISTRATIVE ORDER #371; NOTICE OF MANDATORY ELECTRONIC FILING; CONFIRMATION OF FILING NOTICE

**Service Attempts:  Please Document Date, Time, Disposition:**

3/11/2020 6:35PM ES:  I, EMILIE SMYTHE, PERSONALLY SERVED ATLANTISCHE BEDRIJVEN CV BY SERVING CARL A FERRER AT RAISING CANE'S LOCATED AT 5688 FM-423 N, FRISCO, DENTON COUNTY, TX 75034.

3/11/2020 6:27PM ES:  RECEIVED A CALL FROM THE SUBJECT AT 602-206-9506 STATING THAT HE WOULD BE AVAILABLE TO MEET WITH ME AT RAISING CANE'S LOCATED AT 5688 FM-423 N, FRISCO, TX 75034 IN ABOUT 10 MINUTES.

3/11/2020 6:18PM ES:  ATTEMPTED TO SERVE ATLANTISCHE BEDRIJVEN CV BY SERVING CARL A FERRER AT 7409 KINGSBARNS, THE COLONY, TX 75056. A FEMALE RESIDENT ANSWERED THE DOOR AND IDENTIFIED HERSELF AS THE SUBJECT'S EX-WIFE. SHE STATED THAT HE DOES NOT LIVE HERE AT THIS ADDRESS. CALLED 602-206-9506 AND NO ONE ANSWERED. LEFT VOICEMAIL.

3/10/2020 3:00PM ES:  DOCUMENTS RECEIVED.

AUTHORIZED BY:
TEXAS SUPREME COURT
ID# PSC18281 EXP: 3/31/22
NIGHTHAWK INVESTIGATIONS, INC.

**Manner of Service:**

- ● Personal:  By personally delivering documents to the person or entity being served.
- ○ Substitute at Residence:  By leaving documents at the home of the person being served with a member over 18 years old.
- ○ Substitute at Business:  By leaving documents at the office during normal business hours with the person apparently in charge thereof.
- ○ Posting:  By posting documents in a conspicuous manner to the front door or gate of the person or entity being served.
- ○ Non Service:  After diligent attempts to serve documents, I have been unable to effect process upon the person or entity being served.

I, ___Emilie Smythe___, being first duly sworn, depose and say: that I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to perform said service, and to my personal knowledge, the facts stated in this affidavit are true and correct.

Signed: ___Emilie Smythe___          Date: __3/12/2020__

STATE OF TEXAS:
SUBSCRIBED AND SWORN TO, BEFORE ME THIS __12th__ DAY OF __March 2020__

___Jamie Smythe___
Notary Public

JAMIE SMYTHE
Notary Public, State of Texas
Comm. Expires 08-31-2020
Notary ID 129108455

NightHawk Investigations, Inc.
Post Office Box 1639, Van Alstyne TX 75495

Client# **999**

# NightHawk Investigations, Inc.

NHI ID: **2,126,500**

INVESTIGATION * TRIAL PREPARATION * SURVEILLANCE

Phn (972) 222-HAWK   Fax (972) 222-9940

Person or Entity that was served: **AFFIDAVIT OF PROCESS SERVER**    Employer

| | | | |
|---|---|---|---|
| Subject: | **BACKPAGE.COM LLC BY SERVING CARL A FERRER** | | |
| Add1 | **2531 TUMBLEWEED WAY** | Add2 | **7409 KINGSBARNS** |
| | **FRISCO** **TX** **75034** | | **THE COLONY** **TX** **75056** |

Client Info: **PCVA LAW**    Phn: **206-462-4337**
Attn: **JACK KENNEDY**    Fax: **206-623-3624**
**403 COLUMBIA ST STE 500**
**SEATTLE** **WA** **98104**

**COURT:** **NEW YORK STATE SUPREME COURT, NEW YORK COUNTY**

**DOCKET:** **950015/2020**

**CASE NAME:** **MELANIE THOMPSON VS. BACKPAGE.COM LLC, ET AL**

**DOCUMENTS:**
**SUMMONS; COMPLAINT; ADMINISTRATIVE ORDER #371; NOTICE OF MANDATORY ELECTRONIC FILING; CONFIRMATION OF FILING NOTICE**

**Service Attempts: Please Document Date, Time, Disposition:**

3/11/2020 6:35PM ES: I, EMILIE SMYTHE, PERSONALLY SERVED BACKPAGE.COM LLC BY SERVING CARL A FERRER AT RAISING CANE'S LOCATED AT 5688 FM-423 N, FRISCO, DENTON COUNTY, TX 75034.

3/11/2020 6:27PM ES: RECEIVED A CALL FROM THE SUBJECT AT 602-206-9506 STATING THAT HE WOULD BE AVAILABLE TO MEET WITH ME AT RAISING CANE'S LOCATED AT 5688 FM-423 N, FRISCO, TX 75034 IN ABOUT 10 MINUTES.

3/10/2020 6:18PM ES: ATTEMPTED TO SERVE BACKPAGE.COM LLC BY SERVING CARL A FERRER AT 7409 KINGSBARNS, THE COLONY, TX 75056. A FEMALE RESIDENT ANSWERED THE DOOR AND IDENTIFIED HERSELF AS THE SUBJECT'S EX-WIFE. SHE STATED THAT HE DOES NOT LIVE HERE AT TH ADDRESS. CALLED 602-206-9506 AND NO ONE ANSWERED. LEFT VOICEMAIL.

3/10/2020 3:00PM ES: DOCUMENTS RECEIVED.

AUTHORIZED BY:
TEXAS SUPREME COURT
ID#: PSC18281 EXP: 3/31/22
NIGHTHAWK INVESTIGATIONS, INC.

**Manner of Service:**

- ● Personal: By personally delivering documents to the person or entity being served.
- ○ Substitute at Residence: By leaving documents at the home of the person being served with a member over 18 years old.
- ○ Substitute at Business: By leaving documents at the office during normal business hours with the person apparently in charge thereof.
- ○ Posting: By posting documents in a conspicuous manner to the front door or gate of the person or entity being served.
- ○ Non Service: After diligent attempts to serve documents, I have been unable to effect process upon the person or entity being served.

I, _**Emilie Smythe**_, being first duly sworn, depose and say: that I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to perform said service, and to my personal knowledge, the facts stated in this affidavit are true and correct.

Signed: _**Emilie Smythe**_    Date: _**3/12/2020**_

STATE OF TEXAS:
SUBSCRIBED AND SWORN TO, BEFORE ME THIS _**12th**_ DAY OF _**March 2020**_

_**Jamie Smythe**_
Notary Public

NightHawk Investigations, Inc.
Post Office Box 1639, Van Alstyne TX 75495

JAMIE SMYTHE
Notary Public, State of Texas
Comm. Expires 08-31-2020
Notary ID 129108455

1 of 1

Client#    **999**

# NightHawk Investigations, Inc.

INVESTIGATION * TRIAL PREPARATION * SURVEILLANCE
Phn (972) 222-HAWK   Fax (972) 222-9940

NHI ID:    **2,126,499**

## AFFIDAVIT OF PROCESS SERVER

Person or Entity that was served:

| | | | Employer |
|---|---|---|---|
| Subject: | **CARL A FERRER** | | |
| Add1 | **2531 TUMBLEWEED WAY** | Add2 **7409 KINGSBARNS** | |
| | **FRISCO** TX **75034** | **THE COLONY** TX **75056** | |

Client Info: **PCVA LAW**
Attn: **JACK KENNEDY**
**403 COLUMBIA ST STE 500**
**SEATTLE** WA **98104**

Phn: 206-462-4337
Fax: 206-623-3624

*COURT:* **NEW YORK STATE SUPREME COURT, NEW YORK COUNTY**

*DOCKET:* **950015/2020**

*CASE NAME:* **MELANIE THOMPSON VS. BACKPAGE.COM LLC, ET AL**

*DOCUMENTS:*
**SUMMONS; COMPLAINT; ADMINISTRATIVE ORDER #371; NOTICE OF MANDATORY ELECTRONIC FILING; CONFIRMATION OF FILING NOTICE**

**Service Attempts: Please Document Date, Time, Disposition:**

3/11/2020 6:35PM ES: I, EMILIE SMYTHE, PERSONALLY SERVED CARL A FERRER AT RAISING CANE'S LOCATED AT 5688 FM-423 N, FRISCO, DENTON COUNTY, TX 75034.

3/11/2020 6:27PM ES: RECEIVED A CALL FROM THE SUBJECT AT 602-206-9506 STATING THAT HE WOULD BE AVAILABLE TO MEET WITH ME AT RAISING CANE'S LOCATED AT 5688 FM-423 N, FRISCO, TX 75034 IN ABOUT 10 MINUTES.

3/11/2020 6:18PM ES: ATTEMPTED TO SERVE CARL A FERRER AT 7409 KINGSBARNS, THE COLONY, TX 75056. A FEMALE RESIDENT ANSWERED THE DOOR AND IDENTIFIED HERSELF AS THE SUBJECT'S EX-WIFE. SHE STATED THAT HE DOES NOT LIVE HERE AT THIS ADDRESS. CALLED 602-206-9506 AND NO ONE ANSWERED. LEFT VOICEMAIL.

3/10/2020 3:00PM ES: DOCUMENTS RECEIVED.

AUTHORIZED BY:
TEXAS SUPREME COURT
ID#: PSC 18281 EXP: 3/31/22
NIGHTHAWK INVESTIGATIONS, INC.

**Manner of Service:**

- ● Personal:   By personally delivering documents to the person or entity being served.
- ○ Substitute at Residence:   By leaving documents at the home of the person being served with a member over 18 years old.
- ○ Substitute at Business:   By leaving documents at the office during normal business hours with the person apparently in charge thereof.
- ○ Posting:   By posting documents in a conspicuous manner to the front door or gate of the person or entity being served.
- ○ Non Service:   After diligent attempts to serve documents, I have been unable to effect process upon the person or entity being served.

I, _____Emilie Smythe_____, being first duly sworn, depose and say: that I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to perform said service, and to my personal knowledge, the facts stated in this affidavit are true and correct.

Signed: _____Emilie Smythe_____    Date: _3/12/2020_

STATE OF TEXAS:
SUBSCRIBED AND SWORN TO, BEFORE ME THIS _12th_ DAY OF _March 2020_

_Jamie Smythe_
Notary Public

NightHawk Investigations, Inc.
Post Office Box 1639, Van Alstyne TX 75495

JAMIE SMYTHE
Notary Public, State of Texas
Comm. Expires 08-31-2020
Notary ID 129108455

1 of 1

Client#
**999**

# NightHawk Investigations, Inc.

INVESTIGATION * TRIAL PREPARATION * SURVEILLANCE

Phn (972) 222-HAWK   Fax (972) 222-9940

NHI ID:
**2,126,506**

Person or Entity that was served: **AFFIDAVIT OF PROCESS SERVER**                Employer

Subject: **CF ACQUISITIONS LLC BY SERVING CARL A FERRER**

Add1 **2531 TUMBLEWEED WAY**   Add2 **7409 KINGSBARNS**
**FRISCO**   **TX** **75034**   **THE COLONY**   **TX** **75056**

Client Info: **PCVA LAW**   Phn: **206-462-4337**
Attn: **JACK KENNEDY**   Fax: **206-623-3624**
**403 COLUMBIA ST STE 500**
**SEATTLE**   **WA** **98104**

COURT: **NEW YORK STATE SUPREME COURT, NEW YORK COUNTY**

DOCKET: **950015/2020**

CASE NAME: **MELANIE THOMPSON VS. BACKPAGE.COM LLC, ET AL**

DOCUMENTS:
**SUMMONS; COMPLAINT; ADMINISTRATIVE ORDER #371; NOTICE OF MANDATORY ELECTRONIC FILING; CONFIRMATION OF FILING NOTICE**

Service Attempts: Please Document Date, Time, Disposition:

3/11/2020 6:35PM ES:  I, EMILIE SMYTHE, PERSONALLY SERVED CF ACQUISITIONS LLC BY SERVING CARL A FERRER AT RAISING CANE'S LOCATED AT 5688 FM-423 N, FRISCO, DENTON COUNTY, TX 75034.

3/11/2020 6:27PM ES:  RECEIVED A CALL FROM THE SUBJECT AT 602-206-9506 STATING THAT HE WOULD BE AVAILABLE TO MEET WITH ME AT RAISING CANE'S LOCATED AT 5688 FM-423 N, FRISCO, TX 75034 IN ABOUT 10 MINUTES.

3/11/2020 6:18PM ES:  ATTEMPTED TO SERVE CF ACQUISITIONS LLC BY SERVING CARL A FERRER AT 7409 KINGSBARNS, THE COLONY, TX 75056. A FEMALE RESIDENT ANSWERED THE DOOR AND IDENTIFIED HERSELF AS THE SUBJECT'S EX-WIFE. SHE STATED THAT HE DOES NOT LIVE HERE AT TH ADDRESS. CALLED 602-206-9506 AND NO ONE ANSWERED. LEFT VOICEMAIL.

3/10/2020 3:00PM ES:  DOCUMENTS RECEIVED.

AUTHORIZED BY:
TEXAS SUPREME COURT
ID#: PSC18281 EXP: 3/31/22
NIGHTHAWK INVESTIGATIONS, INC.

Manner of Service:

● Personal:   By personally delivering documents to the person or entity being served.
○ Substitute at Residence:  By leaving documents at the home of the person being served with a member over 18 years old.
○ Substitute at Business:  By leaving documents at the office during normal business hours with the person apparently in charge thereof.
○ Posting:  By posting documents in a conspicuous manner to the front door or gate of the person or entity being served.
○ Non Service:  After diligent attempts to serve documents, I have been unable to effect process upon the person or entity being served.

I, __Emilie Smythe__, being first duly sworn, depose and say: that I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to perform said service, and to my personal knowledge, the facts stated in this affidavit are true and correct.

Signed: __Emilie Smythe__   Date: __3/12/2020__

STATE OF TEXAS:
SUBSCRIBED AND SWORN TO, BEFORE ME THIS __12th__ DAY OF __March 2020__

__Jamie Smythe__
Notary Public

NightHawk Investigations, Inc.
Post Office Box 1639, Van Alstyne TX 75495

JAMIE SMYTHE
Notary Public, State of Texas
Comm. Expires 08-31-2020
Notary ID 129108455

1 of 1

Client# 999

# NightHawk Investigations, Inc.

INVESTIGATION * TRIAL PREPARATION * SURVEILLANCE

Phn (972) 222-HAWK   Fax (972) 222-9940

NHI ID: 2,126,501

**Person or Entity that was served: AFFIDAVIT OF PROCESS SERVER**

Employer

| | |
|---|---|
| Subject: | DARTMOOR HOLDINGS LLC BY SERVING CARL A FERRER |
| Add1 | 2531 TUMBLEWEED WAY |
| | FRISCO   TX   75034 |
| Add2 | 7409 KINGSBARNS |
| | THE COLONY   TX   75056 |
| Client Info: | PCVA LAW |
| Attn: | JACK KENNEDY |
| | 403 COLUMBIA ST STE 500 |
| | SEATTLE   WA   98104 |
| Phn: | 206-462-4337 |
| Fax: | 206-623-3624 |

COURT: **NEW YORK STATE SUPREME COURT, NEW YORK COUNTY**

DOCKET: **950015/2020**

CASE NAME: **MELANIE THOMPSON VS. BACKPAGE.COM LLC, ET AL**

**DOCUMENTS:**

*SUMMONS; COMPLAINT; ADMINISTRATIVE ORDER #371; NOTICE OF MANDATORY ELECTRONIC FILING; CONFIRMATION OF FILING NOTICE*

**Service Attempts:  Please Document Date, Time, Disposition:**

3/11/2020 6:35PM ES:  I, EMILIE SMYTHE, PERSONALLY SERVED DARTMOOR HOLDINGS LLC BY SERVING CARL A FERRER AT RAISING CANE'S LOCATED AT 5688 FM-423 N, FRISCO, DENTON COUNTY, TX 75034.

3/11/2020 6:27PM ES:  RECEIVED A CALL FROM THE SUBJECT AT 602-206-9506 STATING THAT HE WOULD BE AVAILABLE TO MEET WITH ME AT RAISING CANE'S LOCATED AT 5688 FM-423 N, FRISCO, TX 75034 IN ABOUT 10 MINUTES.

3/11/2020 6:18PM ES:  ATTEMPTED TO SERVE DARTMOOR HOLDINGS LLC BY SERVING CARL A FERRER AT 7409 KINGSBARNS, THE COLONY, TX 75056. A FEMALE RESIDENT ANSWERED THE DOOR AND IDENTIFIED HERSELF AS THE SUBJECT'S EX-WIFE. SHE STATED THAT HE DOES NOT LIVE HERE AT THIS ADDRESS. CALLED 602-206-9506 AND NO ONE ANSWERED. LEFT VOICEMAIL.

3/10/2020 3:00PM ES:  DOCUMENTS RECEIVED.

AUTHORIZED BY:
TEXAS SUPREME COURT
ID#: PSC 18281 EXP: 3/31/22
NIGHTHAWK INVESTIGATIONS, INC.

**Manner of Service:**

- ● Personal:  By personally delivering documents to the person or entity being served.
- ○ Substitute at Residence:  By leaving documents at the home of the person being served with a member over 18 years old.
- ○ Substitute at Business:  By leaving documents at the office during normal business hours with the person apparently in charge thereof.
- ○ Posting:  By posting documents in a conspicuous manner to the front door or gate of the person or entity being served.
- ○ Non Service:  After diligent attempts to serve documents, I have been unable to effect process upon the person or entity being served.

I, _Emilie Smythe_, being first duly sworn, depose and say: that I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to perform said service, and to my personal knowledge, the facts stated in this affidavit are true and correct.

Signed: _Emilie Smythe_          Date: _3/12/2020_

STATE OF TEXAS:
SUBSCRIBED AND SWORN TO, BEFORE ME THIS _12th_ DAY OF _March 2020_

_Jamie Smythe_
Notary Public

NightHawk Investigations, Inc.
Post Office Box 1639, Van Alstyne TX 75495

JAMIE SMYTHE
Notary Public, State of Texas
Comm. Expires 08-31-2020
Notary ID 129108455

1 of 1

| Client# | | NHI ID: |
|---|---|---|
| 999 | | 2,126,505 |

# NightHawk Investigations, Inc.

INVESTIGATION * TRIAL PREPARATION * SURVEILLANCE

Phn (972) 222-HAWK   Fax (972) 222-9940

## AFFIDAVIT OF PROCESS SERVER

Person or Entity that was served:

Subject: **KICKAPOO RIVER INVESTMENTS LLC BY SERVING CARL A FERRER**

Employer

| | | |
|---|---|---|
| Add1 | **2531 TUMBLEWEED WAY** | Add2 **7409 KINGSBARNS** |
| | **FRISCO    TX   75034** | **THE COLONY    TX   75056** |

Client Info: PCVA LAW

Attn: JACK KENNEDY

403 COLUMBIA ST STE 500

SEATTLE    WA   98104

Phn: 206-462-4337

Fax: 206-623-3624

*COURT:* **NEW YORK STATE SUPREME COURT, NEW YORK COUNTY**

*DOCKET:* **950015/2020**

*CASE NAME:* **MELANIE THOMPSON VS. BACKPAGE.COM LLC, ET AL**

DOCUMENTS:

**SUMMONS; COMPLAINT; ADMINISTRATIVE ORDER #371; NOTICE OF MANDATORY ELECTRONIC FILING; CONFIRMATION OF FILING NOTICE**

**Service Attempts:  Please Document Date, Time, Disposition:**

3/11/2020 6:35PM ES: I, EMILIE SMYTHE, PERSONALLY SERVED KICKAPOO RIVER INVESTMENTS LLC BY SERVING CARL A FERRER AT RAISING CANE'S LOCATED AT 5688 FM-423 N, FRISCO, DENTON COUNTY, TX 75034.

3/11/2020 6:27PM ES: RECEIVED A CALL FROM THE SUBJECT AT 602-206-9506 STATING THAT HE WOULD BE AVAILABLE TO MEET WITH ME AT RAISING CANE'S LOCATED AT 5688 FM-423 N, FRISCO, TX 75034 IN ABOUT 10 MINUTES.

3/11/2020 6:18PM ES: ATTEMPTED TO SERVE KICKAPOO RIVER INVESTMENTS LLC BY SERVING CARL A FERRER AT 7409 KINGSBARNS, THE COLONY, TX 75056. A FEMALE RESIDENT ANSWERED THE DOOR AND IDENTIFIED HERSELF AS THE SUBJECT'S EX-WIFE. SHE STATED THAT HE DOES NOT LIVE HERE AT THIS ADDRESS. CALLED 602-206-9506 AND NO ONE ANSWERED. LEFT VOICEMAIL.

3/10/2020 3:00PM ES: DOCUMENTS RECEIVED.

AUTHORIZED BY:
TEXAS SUPREME COURT
ID#: PSC 18281 EXP: 3/31/22
NIGHTHAWK INVESTIGATIONS, INC.

**Manner of Service:**

- ● Personal:  By personally delivering documents to the person or entity being served.
- ○ Substitute at Residence:  By leaving documents at the home of the person being served with a member over 18 years old.
- ○ Substitute at Business:  By leaving documents at the office during normal business hours with the person apparently in charge thereof.
- ○ Posting:  By posting documents in a conspicuous manner to the front door or gate of the person or entity being served.
- ○ Non Service:  After diligent attempts to serve documents, I have been unable to effect process upon the person or entity being served.

I, _____Emilie Smythe_____, being first duly sworn, depose and say: that I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to perform said service, and to my personal knowledge, the facts stated in this affidavit are true and correct.

Signed: _____Emilie Smythe_____    Date: _3/12/2020_

STATE OF TEXAS:

SUBSCRIBED AND SWORN TO, BEFORE ME THIS __12th__ DAY OF _March 2020_

_Jamie Smythe_

Notary Public

NightHawk Investigations, Inc.

Post Office Box 1639, Van Alstyne TX 75495

JAMIE SMYTHE
Notary Public, State of Texas
Comm. Expires 08-31-2020
Notary ID 129108455

1 of 1

| Client# | | NHI ID: |
|---|---|---|
| 999 | | 2,126,504 |

# NightHawk Investigations, Inc.

INVESTIGATION * TRIAL PREPARATION * SURVEILLANCE

Phn (972) 222-HAWK    Fax (972) 222-9940

Person or Entity that was served: **AFFIDAVIT OF PROCESS SERVER**    Employer

Subject: **LUPINE HOLDINGS LLC BY SERVING CARL A FERRER**

| Add1 | 2531 TUMBLEWEED WAY | Add2 | 7409 KINGSBARNS | | |
|---|---|---|---|---|---|
| | FRISCO    TX    75034 | | THE COLONY    TX    75056 | | |

Client Info: PCVA LAW    Phn: 206-462-4337
Attn: JACK KENNEDY    Fax: 206-623-3624
403 COLUMBIA ST STE 500
SEATTLE    WA    98104

COURT: **NEW YORK STATE SUPREME COURT, NEW YORK COUNTY**

DOCKET: **950015/2020**

CASE NAME: **MELANIE THOMPSON VS. BACKPAGE.COM LLC, ET AL**

**DOCUMENTS:**

SUMMONS; COMPLAINT; ADMINISTRATIVE ORDER #371; NOTICE OF MANDATORY ELECTRONIC FILING; CONFIRMATION OF FILING NOTICE

**Service Attempts:  Please Document Date, Time, Disposition:**

3/11/2020 6:35PM ES: I, EMILIE SMYTHE, PERSONALLY SERVED LUPINE HOLDINGS LLC BY SERVING CARL A FERRER AT RAISING CANE'S LOCATED AT 5688 FM-423 N, FRISCO, DENTON COUNTY, TX 75034.

3/11/2020 6:27PM ES:  RECEIVED A CALL FROM THE SUBJECT AT 602-206-9506 STATING THAT HE WOULD BE AVAILABLE TO MEET WITH ME AT RAISING CANE'S LOCATED AT 5688 FM-423 N, FRISCO, TX 75034 IN ABOUT 10 MINUTES.

3/11/2020 6:18PM ES:  ATTEMPTED TO SERVE LUPINE HOLDINGS LLC BY SERVING CARL A FERRER AT 7409 KINGSBARNS, THE COLONY, TX 75056. A FEMALE RESIDENT ANSWERED THE DOOR AND IDENTIFIED HERSELF AS THE SUBJECT'S EX-WIFE. SHE STATED THAT HE DOES NOT LIVE HERE AT TH ADDRESS. CALLED 602-206-9506 AND NO ONE ANSWERED. LEFT VOICEMAIL.

3/10/2020 3:00PM ES:  DOCUMENTS RECEIVED.

AUTHORIZED BY:
TEXAS SUPREME COURT
ID#: PSC 18281 EXP: 3/31/22
NIGHTHAWK INVESTIGATIONS, INC.

**Manner of Service:**

- ● Personal:  By personally delivering documents to the person or entity being served.
- ○ Substitute at Residence:  By leaving documents at the home of the person being served with a member over 18 years old.
- ○ Substitute at Business:  By leaving documents at the office during normal business hours with the person apparently in charge thereof.
- ○ Posting:  By posting documents in a conspicuous manner to the front door or gate of the person or entity being served.
- ○ Non Service:  After diligent attempts to serve documents, I have been unable to effect process upon the person or entity being served.

I, _Emilie Smythe_, being first duly sworn, depose and say: that I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to perform said service, and to my personal knowledge, the facts stated in this affidavit are true and correct.

Signed: _Emilie Smythe_    Date: _3/12/2020_

STATE OF TEXAS:
SUBSCRIBED AND SWORN TO, BEFORE ME THIS _12th_ DAY OF _March 2020_

_Jamie Smythe_
Notary Public

NightHawk Investigations, Inc.
Post Office Box 1639, Van Alstyne TX 75495

JAMIE SMYTHE
Notary Public, State of Texas
Comm. Expires 08-31-2020
Notary ID 129108455

1 of 1

| Client# | | NHI ID: |
|---|---|---|
| **999** | # NightHawk Investigations, Inc. | **2,126,508** |

INVESTIGATION * TRIAL PREPARATION * SURVEILLANCE
Phn (972) 222-HAWK   Fax (972) 222-9940

## AFFIDAVIT OF PROCESS SERVER

Person or Entity that was served:                                         Employer

Subject: **UGC TECH GROUP CV BY SERVING CARL A FERRER**

| Add1 | **2531 TUMBLEWEED WAY** | Add2 | **7409 KINGSBARNS** | | |
|---|---|---|---|---|---|
| | **FRISCO**  TX  **75034** | | **THE COLONY**  TX  **75056** | | |

Client Info: PCVA LAW                   Phn: 206-462-4337
Attn: JACK KENNEDY                       Fax: 206-623-3624
      403 COLUMBIA ST STE 500
      SEATTLE          WA  98104      **COURT:  NEW YORK STATE SUPREME COURT, NEW YORK COUNTY**

                                       **DOCKET:  950015/2020**

                                       CASE NAME: **MELANIE THOMPSON VS. BACKPAGE.COM LLC, ET AL**

DOCUMENTS:
**SUMMONS; COMPLAINT; ADMINISTRATIVE ORDER #371; NOTICE OF MANDATORY ELECTRONIC FILING; CONFIRMATION OF FILING NOTICE**

**Service Attempts:  Please Document Date, Time, Disposition:**

3/11/2020 6:35PM ES:  I, EMILIE SMYTHE, PERSONALLY SERVED UGC TECH GROUP CV BY SERVING CARL A FERRER AT RAISING CANE'S LOCATED AT 5688 FM-423 N, FRISCO, DENTON COUNTY, TX 75034.

3/11/2020 6:27PM ES:  RECEIVED A CALL FROM THE SUBJECT AT 602-206-9506 STATING THAT HE WOULD BE AVAILABLE TO MEET WITH ME AT RAISING CANE'S LOCATED AT 5688 FM-423 N, FRISCO, TX 75034 IN ABOUT 10 MINUTES.

3/11/2020 6:18PM ES:  ATTEMPTED TO SERVE UGC TECH GROUP CV BY SERVING CARL A FERRER AT 7409 KINGSBARNS, THE COLONY, TX 75056. A FEMALE RESIDENT ANSWERED THE DOOR AND IDENTIFIED HERSELF AS THE SUBJECT'S EX-WIFE. SHE STATED THAT HE DOES NOT LIVE HERE AT TH ADDRESS. CALLED 602-206-9506 AND NO ONE ANSWERED. LEFT VOICEMAIL.

3/10/2020 3:00PM ES:  DOCUMENTS RECEIVED.

AUTHORIZED BY:
TEXAS SUPREME COURT
ID#: PSC 18281  EXP: 3/31/22
NIGHTHAWK INVESTIGATIONS, INC.

**Manner of Service:**

- ● Personal:  By personally delivering documents to the person or entity being served.
- ○ Substitute at Residence:  By leaving documents at the home of the person being served with a member over 18 years old.
- ○ Substitute at Business:  By leaving documents at the office during normal business hours with the person apparently in charge thereof.
- ○ Posting:  By posting documents in a conspicuous manner to the front door or gate of the person or entity being served.
- ○ Non Service:  After diligent attempts to serve documents, I have been unable to effect process upon the person or entity being served.

I, _Emilie Smythe_ , being first duly sworn, depose and say: that I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to perform said service, and to my personal knowledge, the facts stated in this affidavit are true and correct.

Signed: _Emilie Smythe_            Date: _3/12/2020_

STATE OF TEXAS:
SUBSCRIBED AND SWORN TO, BEFORE ME THIS _12th_ DAY OF _March 2020_

_Jamie Smythe_
Notary Public

NightHawk Investigations, Inc.
Post Office Box 1639, Van Alstyne TX 75495

JAMIE SMYTHE
Notary Public, State of Texas
Comm. Expires 08-31-2020
Notary ID 129108455

1 of 1

| Client# | | NHI ID: |
|---|---|---|
| 999 | | 2,126,502 |

# NightHawk Investigations, Inc.

INVESTIGATION * TRIAL PREPARATION * SURVEILLANCE

Phn (972) 222-HAWK   Fax (972) 222-9940

Person or Entity that was served: **AFFIDAVIT OF PROCESS SERVER**

Employer

| Subject: | WEBSITE TECHNOLOGIES LLC BY SERVING CARL A FERRER | | | | | | |
|---|---|---|---|---|---|---|---|
| Add1 | 2531 TUMBLEWEED WAY | | | Add2 | 7409 KINGSBARNS | | |
| | FRISCO | TX | 75034 | | THE COLONY | TX | 75056 |

| Client Info: | PCVA LAW | Phn: | 206-462-4337 |
|---|---|---|---|
| Attn: | JACK KENNEDY | Fax: | 206-623-3624 |
| | 403 COLUMBIA ST STE 500 | | |
| | SEATTLE | WA | 98104 |

**COURT:** *NEW YORK STATE SUPREME COURT, NEW YORK COUNTY*

**DOCKET:** *950015/2020*

**CASE NAME:** *MELANIE THOMPSON VS. BACKPAGE.COM LLC, ET AL*

**DOCUMENTS:**

*SUMMONS; COMPLAINT; ADMINISTRATIVE ORDER #371; NOTICE OF MANDATORY ELECTRONIC FILING; CONFIRMATION OF FILING NOTICE*

**Service Attempts: Please Document Date, Time, Disposition:**

3/11/2020 6:35PM ES: I, EMILIE SMYTHE, PERSONALLY SERVED WEBSITE TECHNOLOGIES LLC BY SERVING CARL A FERRER AT RAISING CANE'S LOCATED AT 5688 FM-423 N, FRISCO, DENTON COUNTY, TX 75034.

3/11/2020 6:27PM ES: RECEIVED A CALL FROM THE SUBJECT AT 602-206-9506 STATING THAT HE WOULD BE AVAILABLE TO MEET WITH ME AT RAISING CANE'S LOCATED AT 5688 FM-423 N, FRISCO, TX 75034 IN ABOUT 10 MINUTES.

3/11/2020 6:18PM ES: ATTEMPTED TO SERVE WEBSITE TECHNOLOGIES LLC BY SERVING CARL A FERRER AT 7409 KINGSBARNS, THE COLONY, TX 75056. A FEMALE RESIDENT ANSWERED THE DOOR AND IDENTIFIED HERSELF AS THE SUBJECT'S EX-WIFE. SHE STATED THAT HE DOES NOT LIVE HERE AT THIS ADDRESS. CALLED 602-206-9506 AND NO ONE ANSWERED. LEFT VOICEMAIL.

3/10/2020 3:00PM ES: DOCUMENTS RECEIVED.

AUTHORIZED BY:
TEXAS SUPREME COURT
ID#: PSC18281 EXP: 3/31/22
NIGHTHAWK INVESTIGATIONS, INC.

**Manner of Service:**

- ● Personal: By personally delivering documents to the person or entity being served.
- ○ Substitute at Residence: By leaving documents at the home of the person being served with a member over 18 years old.
- ○ Substitute at Business: By leaving documents at the office during normal business hours with the person apparently in charge thereof.
- ○ Posting: By posting documents in a conspicuous manner to the front door or gate of the person or entity being served.
- ○ Non Service: After diligent attempts to serve documents, I have been unable to effect process upon the person or entity being served.

I, ___Emilie Smythe___, being first duly sworn, depose and say: that I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to perform said service, and to my personal knowledge, the facts stated in this affidavit are true and correct.

Signed: ___Emilie Smythe___   Date: ___3/12/2020___

STATE OF TEXAS:
SUBSCRIBED AND SWORN TO, BEFORE ME THIS __12th__ DAY OF __March 2020__

___Jamie Smythe___
Notary Public

JAMIE SMYTHE
Notary Public, State of Texas
Comm. Expires 08-31-2020
Notary ID 129108455

NightHawk Investigations, Inc.
Post Office Box 1639, Van Alstyne TX 75495

1 of 1

## IN THE SUPREME COURT NEW YORK COUNTY STATE OF NEW YORK

Melanie Thompson                                                    NO. 950015/2020

         Plaintiff(s)/Petitioner(s),

VS.                                                                AFFIDAVIT OF SERVICE OF PROCESS

Backpage.com, LLC, ET.AL,

         Defendant(s)/Respondent(s).


I **Zachary Paul Mueller** Being duly sworn, depose and say that I am fully qualified under state law to serve process within the jurisidiction where the documents were served, and executed service in the manner described below:

Documents Served: **Letter; Summons; Complaint; Amended Administrative Order #371; Notice Of Electronic Filing**

Service Upon: **Michael Gerard Lacey**

Date of Service: **Thu, Mar 19 2020**                    Time of Service: **11:11 AM**

Address of Service: **3300 E Stella Ln, Paradise Valley, AZ 85253**

Manner of Service:

[ X ] By Serving **Michael Gerard Lacey** in person.
[ ] Substitute, by serving _____, a person of suitable age and discretion who resides with at the address of service.
[ ] By personally serving _____ who holds the position of
[ ] Other Service, As Detailed Below.
[ ] Non-Service for the Reasons Detailed Below.

Description: Age: 72; Ethnicity: Caucasian; Gender: Male; Height: 6'; Hair: White


I certify under penalty of perjury that the foregoing is true and correct.

_____

Declarant: Zachary Paul Mueller
Registered in MC-8735
Job Number: 4400584


Subscribed and Sworn to before
me this _20_ day of _March_, 2020.

_____

Notary Public

CRAIG PODGURSKI JR
Notary Public - Arizona
Maricopa County
My Comm. Expires Dec 15, 2020

SUPREME COURT OF THE STATE OF NEW YORK
COUNTIES OF BRONX, KINGS, NEW YORK, QUEENS AND RICHMOND

---

In re: CHILD VICTIMS ACT LITIGATION                    CASE MANAGEMENT
                                                       ORDER No. 2

---

This Case Management Order No. 2 ("CMO 2") applies to all actions filed or hereafter filed in the Supreme Courts in and for the counties of Bronx, Kings, New York, Queens, and Richmond pursuant to the Child Victims Act (the "CVA Actions").

CMO 2 modifies the deadlines set forth in §§ VII, VIII, and IX of Case Management Order No. 1, issued and made effective on February 24, 2020 ("CMO 1"), pursuant to the authority of this Court and the tolling provisions of Executive Order 202.8 as extended by subsequent Executive Orders, including Executive Order 202.38. Pursuant to Executive Order 202.38 the tolling period is set to expire on July 6, 2020. Accordingly,

**IT IS HEREBY ORDERED** that the following supersede and replace sections VII, VIII, and IX of CMO 1, and that those sections are hereby amended to direct, as follows:

**VII.    Procedures for Responses to Complaints.**

1.    The time to answer, move against, or otherwise respond to any complaint or amended complaint that was served upon the responding defendant between August 14, 2019 through and including October 14, 2019, is extended until **July 22, 2020.**

2.    The time to answer, move against, or otherwise respond to any complaint or amended complaint that was served upon the responding defendant between October 15, 2019 through and including December 11, 2019, is extended until **August 3, 2020.**

3.    The time to answer, move against, or otherwise respond to any complaint or amended complaint that was served upon the responding defendant between December 12, 2019 through and including February 11, 2020, is extended until **August 12, 2020.**

4.    The time to answer, move against, or otherwise respond to any complaint or amended complaint that was served upon the responding defendant between February 12, 2020 through and including May 24, 2020, is extended until **August 21, 2020.**

5.    The time to answer, move against, or otherwise respond to any complaint or amended complaint that was served upon the responding defendant between May 25, 2020 through and including June 26, 2020, is extended until **August 31, 2020.**

6.    The time to answer, move against, or otherwise respond to any complaint or amended complaint that was served upon the responding defendant on June 27, 2020 and later shall be **65**-days from the date of service upon the responding defendant.

7.    In matters filed solely against individual defendants with no corporate or municipal or institutional defendants, the time to answer, move against, or otherwise respond to any complaint or amended complaint that was served upon the individual defendant prior to December 12, 2019, is extended until **July 13, 2020**.

8.    In matters filed solely against individual defendants with no corporate or municipal or institutional defendants, the time to answer, move against, or otherwise respond to any complaint or amended complaint that was served upon the individual defendant between December 12, 2019 through and including February 11, 2020, is extended until **July 17, 2020**.

9.    In matters filed solely against individual defendants with no corporate or municipal or institutional defendants, the time to answer, move against, or otherwise respond to any complaint or amended complaint that was served upon the individual defendant between February 12, 2020 through and including May 24, 2020, is extended until **July 22, 2020**.

10.   In matters filed solely against individual defendants with no corporate or municipal or institutional defendants, the time to answer, move against, or otherwise respond to any complaint or amended complaint that was served upon the individual defendant between May 25, 2020 through and including June 26, 2020, is extended until **July 27, 2020**.

11.   In matters filed solely against individual defendants with no corporate or municipal or institutional defendants, the time to answer, move against, or otherwise respond to any complaint or amended complaint that was served upon the individual defendant on June 27, 2020 and later shall be **35**-days from the date of service upon the individual defendant.

12.   The time to answer, move against, or otherwise respond to any complaint or amended complaint that was re-filed and served upon the responding defendant before June 19, 2020 pursuant to a stipulation consenting to or an Order of this Court directing the severance of a CVA Action that was originally filed as a multi-plaintiff CVA Action, is extended until **August 3, 2020**.

13.   The time to answer, move against, or otherwise respond to any complaint or amended complaint that was re-filed and served upon the responding defendant on June 20, 2020 or later pursuant to a stipulation consenting to or an Order of this Court directing the severance of a CVA Action that was originally filed as a multi-plaintiff CVA Action shall be 45-days from

2

the date the complaint or amended complaint is served upon the responding defendant.

14. The deadlines set forth in this section supersede any deadlines for answering or otherwise responding to a complaint or amended complaint that were **provided by CMO 1**. In the event the parties stipulated to longer deadlines than those set forth above, the stipulation will control.

15. Absent agreement by the parties or Order of this Court, no motion to dismiss shall stay discovery unless the moving party seeks to dismiss the complaint in its entirety. In the event that a party moves to dismiss the complaint in its entirety, discovery shall be stayed only as to that moving defendant and shall proceed as against the remaining defendants.

## VIII. Procedures for Responses to Pending Motions.

1. **In the absence of a briefing schedule consented to by the parties and/or ordered by the Court**, the time to serve opposition papers to any Order to Show Cause or Notice of Motion, including motions to dismiss under CPLR 3211 or 3212, but excluding motions to proceed anonymously or by pseudonym, that were filed and served prior to this Court's Administrative Order #40 dated February 4, 2020, is extended to **July 17, 2020**.

2. **In the absence of a briefing schedule consented to by the parties and/or ordered by the Court**, the time to serve opposition papers to any Order to Show Cause or Notice of Motion, including motions to dismiss under CPLR 3211 or 3212, but excluding motions to proceed anonymously or by pseudonym, that were filed and served between February 4, 2020 through and including May 4, 2020, is extended to **August 3, 2020**.

3. Should the motion(s) not be resolved or withdrawn by the parties as of the date prescribed by **paragraphs 1 or 2** of this section, the Court will set any additional due dates as necessary for reply papers, return date, and oral argument.

4. The deadlines set forth in this section supersede the deadlines for the service of opposition papers and the filing of working copies of motion papers that were **provided by CMO 1**. In the event the parties stipulated to longer deadlines than those set forth above, the stipulation will control.

## IX. Disclosure.

### A.   Confidentiality Order.

1. **On or before June 22, 2020**, Plaintiffs' and Defendants' Liaison Counsel shall jointly submit a proposed Confidentiality Order (or alternate

3

proposals) that will apply to disclosure in all CVA Actions. Defendants' disclosure in any CVA Action shall not take place prior to entry by the Court of a Confidentiality Order.

B.    <u>Disclosure Requests.</u>

    1.    Plaintiffs shall serve responses and/or objections to Standard Automatic Disclosures and Common Demand for Verified Bill of Particulars in an individual action upon the answering defendant **within 30 days of a** defendant filing an answer, motion or other response to the complaint or amended complaint, except as provided in **section VII.13.**

    2.    Each defendant shall serve responses and/or objections to Standard Automatic Disclosures in each individual action no later than 30 days after receiving plaintiff's responses and objections described above in paragraph IX.B.1, or within 25 days of entry by the Court of a Confidentiality Order, whichever date is later.

    3.    Each plaintiff and defendant shall serve responses and/or objections to Standard Combined Demands/Notices to Produce no later than 40 days after service of the responding defendant's responses and/or objections described above in paragraph IX.B.2.

    4.    Unless otherwise agreed by the parties to a CVA Action, responses and/or objections to any disclosure demands are to be served by U.S. Mail or its equivalent, and/or electronically where consented to by the parties. Consent to electronic service shall not be unreasonably withheld. Responses and/or objections will not be e-filed on the Court's docket by any party. However, subject to the Court's forthcoming Confidentiality Order, excerpts of such responses may be e-filed if they are pertinent exhibits to a motion, *e.g.* in a motion to compel.

    5.    Any party may serve supplemental, non-repetitive disclosure requests in accordance with the CPLR and applicable discovery submission schedule for that action. Counsel shall exercise good faith in determining the need for such further requests.

    6.    None of the requests attached to this Order shall be construed to be interrogatories for purposes of CPLR § 3130. No party may avoid sitting for a deposition by reason of responding to the discovery requests contained in this Order.

    7.    To the extent a defendant has filed an answer before the effective date of this Order, the time for a plaintiff to serve responses and/or objections to Standard Automatic Disclosures and Common Demand for Verified Bill of Particulars shall be **30 days after the response date to the complaint that would be applicable to the matter pursuant to section VII or 30 days from entry by the Court of a Confidentiality Order, whichever is**

4

**later.** All other discovery deadlines shall follow the provisions of this section as set forth herein.

C.    <u>Standard Plaintiff Disclosures and Authorizations.</u>

1.    Standard Automatic Disclosures directed at Plaintiffs are attached hereto as Exhibit A to this Order.

2.    Common Demand for Verified Bill of Particulars directed at Plaintiffs is attached hereto as Exhibit B to this Order.

3.    Standard Automatic Disclosures directed at Defendants are attached hereto as Exhibit C to this Order.

4.    Proposed Standard Combined Demands directed at Plaintiffs shall be provided to the Court within 20 days of the effective date of this Order and shall become Exhibit D to this Order.

5.    Proposed Standard Combined Demands directed at Defendants shall be provided to the Court within 20 days of the effective date of this Order days and shall become Exhibit E to this Order.

6.    All disclosure requests listed in this section are deemed served as of the date of the response to the complaint.

7.    All parties retain their rights to object and/or to move with regard to the foregoing demands in accordance with the CPLR and existing case law. The fact that these demands are made a part of the Case Management Order does not in any way alter or waive a party's right to object and/or to move with regard to any of the demands herein.

    **IT IS HEREBY ORDERED** that sections I-VI, and X-XII of CMO 1 remain unchanged; and

    **IT IS FURTHER HEREBY ORDERED** that the effective date of this Order shall be the date it is uploaded to the Court's Docket on NYSCEF.

DATED:    June _16_, 2020

                        SO ORDERED  ·

                        _George J. Silver_
                        ————————————————————————
                        HON. GEORGE J. SILVER
                        DEPUTY CHIEF ADMINISTRATIVE JUDGE
                        NEW YORK CITY COURTS

                        5        GEORGE J. SILVER

SUPREME COURT OF THE STATE OF NEW YORK
COUNTIES OF BRONX, KINGS, NEW YORK, QUEENS AND RICHMOND
————————————————————————————

In re:  CHILD VICTIMS ACT LITIGATION          EXHIBIT A to CASE MANAGEMENT
                                              ORDER No. 2, Sec. IX.C.1


————————————————————————————


**STANDARD AUTOMATIC DISCLOSURES DIRECTED AT PLAINTIFFS**


Plaintiffs' response to Automatic Disclosures:  Absent good cause shown and pursuant to Section IX of Case Management Order No. 2, and any subsequent Case Management Order issued by the Court, within 30 days of the filing of an Answer in a CVA action, plaintiff shall serve upon the answering defendant a response to the following:

1. Response to this Standard Automatic Disclosures directed at Plaintiffs and Common Demand for Verified Bill of Particulars.

2. Duly executed HIPAA-compliant authorizations[1] together with the name and last known address for the medical provider and/or facility for the following:

**Item 1.  Medical Records:**

(a) each pediatrician, physician, specialist and/or medical, mental health or other health care provider (e.g. nurse practitioner) or health care screener (i) that treated plaintiff with respect to any physical or mental condition alleged in the complaint or bill of particulars from the first date of the alleged abuse through the present, and (ii) that treated plaintiff with respect to any physical or mental condition at any time during the two (2) years prior to the first date of the alleged abuse;

(b) each hospital, emergency room, walk-in clinic and/or urgent care clinic (i) that treated plaintiff for any physical or mental condition alleged in the complaint or bill of particulars from the first date of the alleged abuse through the present, and (ii) that treated plaintiff with respect to any physical or mental condition at any time during the two (2) years prior to the first date of the alleged abuse;

---

[1]  In processing authorizations provided by plaintiff during the course of the CVA litigation, defendants will make best efforts not to disclose the caption of the subject litigation or the fact that plaintiff is a party to litigation. In the event an authorization is insufficient to obtain the records sought in this and any subsequent demands, defendants reserve their rights and will not be precluded from issuing subpoenas or filing motions for the production of documents from third-parties pursuant to the CPLR and existing case law.

(c) each pharmacy (i) that has provided prescription medications to plaintiff for any physical or mental condition alleged in the complaint or bill of particulars from the first date of the alleged abuse through the present, and (ii) that provided prescription medications to plaintiff at any time during the two (2) years prior to the first date of the alleged abuse to the present;

(d) each and every hospital or radiology practice where plaintiff has received x-rays; CT scans, MR images, and/or PET scans or any other diagnostic test (i) with respect to any physical or mental condition alleged in the complaint or bill of particulars from the first date of the alleged abuse through the present, and (ii) with respect to any physical or mental condition at any time during the two (2) years prior to the first date of the alleged abuse;

(e) each infirmary, health center or medical division, department or office within any jail, juvenile detention center or penitentiary (i) that provided medical care and treatment for any physical or mental condition alleged in the complaint or bill of particulars from the first date of the alleged abuse through the present, and (ii) that provided medical care and treatment to plaintiff for any physical or mental condition at any time during the two (2) years prior to the first date of the alleged abuse;

(f) each school, college or university health services (i) that provided medical care and treatment for any physical or mental condition alleged in the complaint or bill of particulars from the first date of the alleged abuse through the present, and (ii) that provided medical care and treatment to plaintiff for any physical or mental condition at any time during the two (2) years prior to the first date of the alleged abuse.

**Item 2.  Mental Health Records:**

(a) each mental health professional or provider, who has ever treated plaintiff or with whom plaintiff has ever consulted in any capacity at any time in plaintiff's life;

(b) each psychiatric treatment facility, hospital, clinic and/or center where plaintiff has received treatment and/or has been admitted at any time in plaintiff's life;

(c) each infirmary, health center or medical division, department or office within any jail, juvenile detention center or penitentiary where plaintiff has ever been housed at any time in plaintiff's life;

2

(d) each school, college or university mental health or counseling services at any time in plaintiff's life;

(e) each alcohol, drug and/or addiction clinic and/or treatment center providing emotional, psychiatric or psychological or neuropsychiatric services where plaintiff has ever received treatment and/or has been admitted at any time in plaintiff's life.

### Item 3.  Marriage/Couples' Counseling:

(a) Where plaintiff alleges damage to his/her marriage or ability to form or maintain romantic and/or sexual relationships, or where plaintiff's spouse or domestic partner asserts a cause of action for loss of services, each plaintiff shall provide an authorization for each provider, practice, group, institution, center, and/or individual practitioner where plaintiff has sought marriage counseling, marriage therapy, couples' counseling and/or couples' therapy at any time in plaintiff's life subject to appropriate redactions where the spouse has not placed his/her condition in controversy.

### Item 4.  Employment Records:

(a) To the extent plaintiff asserts a claim for loss of earnings, plaintiff shall provide a fully executed authorization[2] allowing defendants to obtain plaintiff's employment file(s), personnel file(s), human resources file(s), performance file(s), earnings file(s), benefits file(s), and disciplinary file(s) from plaintiff's current employer.

(b) For any period during which plaintiff asserts a claim for loss of earnings and for five years prior to that period, if a claim for loss of earnings is asserted, plaintiff shall provide with respect to any employers, specifically excluding any current employer, a fully executed authorization allowing defendants to obtain plaintiffs employment file(s), personnel file(s), human resources file(s), performance file(s), benefits file(s), and disciplinary file(s).

### Item 5.  Educational Records:

Fully executed authorizations and waivers of confidentiality, including appropriate HIPAA-compliant and/or FERPA-compliant language allowing for and directing release to defendants of any documents and statements from each elementary, junior high/middle school, and high school or institution of

---

[2]  See fn. 1.

3

higher learning (college, university, graduate school, professional school, etc.,) that plaintiff attended, including but not limited to documents relating to:

(a) grades, and or academic performance;
(b) parent-administration conferences;
(c) attendance records;
(d) standardized testing records;
(e) student transcripts;
(f) disciplinary records; and
(g) student health or mental health or counselling records.


### Item 6.  Law Enforcement/Children's Services/Prior Claims:

(a) Fully executed and unlimited HIPAA-compliant authorizations executed by plaintiff affording defendants unlimited access to any documents and statements relating to any past and/or ongoing or current investigation including all files, documents, referrals and investigations into plaintiff and/or plaintiff's family, including foster family, and the household or foster household in which plaintiff was residing at the time of the alleged abuse and at any time in plaintiff's life before or since the abuse alleged in the Complaint took place, by each private, non-profit or governmental entity that protects and promotes the well-being of children including but not limited to the NYS Office of Children and Family Services, NYC Administration for Children's Services ("ACS") or any child welfare agency or organization or victims' advocacy or counseling organization relating to the allegations in the Complaint;

(b) Fully executed and unlimited HIPAA-compliant authorizations and New York Civil Rights Law 50-b waiver executed by plaintiff affording defendants unlimited access to any documents and statements, including but not limited to complaints, files, documents, referrals and investigations by each law enforcement entity, including but not limited to any police department and any Office of the District Attorney, U.S. Attorney's Office, State Attorneys General or relevant public prosecutor, relating to:

   i.   the allegations of sexual abuse of plaintiff as asserted in the Complaint and Verified Bill of Particulars; and
   ii.  any other allegation of abuse that plaintiff has ever alleged or asserted against any other entity, individual, institution, employer, school, or organization that is not a party to the CVA action;

(c) All records of any complaint of alleged sexual abuse or assault or physical abuse or assault, including any prior claim, complaint, statement, allegation, and/or sworn statement of plaintiff against any entity or person, including:

4

       i.   a waiver of any confidentiality which may otherwise preclude disclosure of the underlying facts of such claims; and

      ii.   a waiver of any confidentiality which may otherwise preclude disclosure of plaintiff's allegations, statements and testimony;

(d) Fully executed, HIPAA-compliant authorizations and New York Civil Rights Law 50-b waivers for all items identified in response to paragraph (c) and (d);

(e) Fully executed, HIPAA-compliant authorizations, unsealing authorizations, and New York Civil Rights Law 50-b waivers for all Family Court records relating to plaintiff in the CVA action and/or to plaintiff's family of origin, household in which plaintiff resided at the time of the alleged abuse, or foster placement family(ies), if relevant, including HIPAA-compliant and unsealing authorizations for records of neglect, removal, PINS records, or juvenile delinquency proceedings.

3.   Copies of all written statements, tape recordings, videotapes or any transcripts or notes thereof, electronic or otherwise made by or on behalf of the above-named defendant(s) whether signed or unsigned, or the transcript of any electronically recorded statement in accordance with CPLR 3101(e).

4.   The names and addresses of all eyewitnesses and notice witnesses to the allegations set forth in the complaint and/or bill of particulars.

Objections to discovery based on privilege, confidentiality or immunity shall state with some specificity that the documents in each category are entitled to protected status; expressly justify the privilege asserted for each category; and describe the nature of the documents to be protected in a manner that will enable the other parties to assess the claim without revealing the privileged information. No documents or information subject to a claim of privilege, confidentiality or immunity from disclosure shall be produced until the claim of privilege, confidentiality or immunity is resolved by the Court.

Nothing contained in these automatic disclosures shall be considered a waiver of any party's rights to pursue any further discovery including, but not limited to, discovery requested above, but for a different time frame.

These demands shall be deemed to continue during the pendency of the CVA action, including the trial thereof.

All parties retain their rights to object and/or to move with regard to the foregoing demands in accordance with the CPLR and existing case law. The fact that these demands are made a part of the Case Management Order does not in any way alter or waive a party's right to object and/or to move with regard to any of the demands herein.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTIES OF BRONX, KINGS, NEW YORK, QUEENS AND RICHMOND
_____

In re: CHILD VICTIMS ACT LITIGATION          EXHIBIT B to CASE MANAGEMENT
                                             ORDER No. 2, Sec. IX.C.2


_____


## COMMON DEMAND FOR VERIFIED BILL OF PARTICULARS
## DIRECTED AT PLAINTIFFS


           PLEASE TAKE NOTICE that each Plaintiff is hereby required, pursuant to Civil
Practice Law and Rules § 3041 *et seq.* and Section IX of Case Management Order No. 2, and any
applicable subsequent Case Management Order issued by the Court, to serve upon attorneys for
Defendants a Verified Bill of Particulars responding to the below demands within the time period
specified by the Court pursuant to Case Management Order No. 2.

### I. Plaintiff's Background Information.

           1.     Set forth Plaintiff's full name including all prior legal names, maiden
names, and any aliases used throughout Plaintiff's life, and the approximate period(s) of time
over which such names were used.

           2.     If not previously provided, set forth Plaintiff's name at the time of the
alleged abuse, date of birth, social security number, parents and/or guardian's names at the time
of the alleged abuse, current address, and address at the time of the alleged abuse, if known.
(Date of birth and social security number may be provided in a document separate from
Plaintiff's other responses to this demand for particulars).

### II. Alleged Conduct.

           3.     With respect to the alleged sexual abuse claimed in the Complaint
("alleged abuse"), state:

           a.  the name of each person who Plaintiff alleges committed the alleged
               abuse;
           b.  each act of alleged abuse
           c.  the date and approximate time of day of the occurrence; and
           d.  the location(s) of the alleged abuse and, if known, the address(es) of the
               locations.

           4.      If Plaintiff claims that the individual(s) identified in response to Demand
No. 3.a violated any statute, law, rule, ordinance or regulation, provide the citation, including
specific subdivision, of each statute, law, rule, ordinance, or regulation allegedly violated and the

alleged acts or omissions giving rise to the alleged violation. (Plaintiff is required to identify the specific subdivision of New York's penal law on which his or her claims are brought under the Child Victims Act.)

5. If Plaintiff claims that any Defendant violated any statute, law, rule, ordinance or regulation, for each Defendant set forth the specific (including subdivision) statute, law, rule, ordinance(s), or regulation allegedly violated and the alleged acts or omissions giving rise to the alleged violation.

6. Identify each cause of action and/or theory of liability alleged in the Complaint, and, for each, separately describe in detail all alleged acts or omissions of each Defendant (for institutional Defendants, if known, identify the agents, servants, or employees who allegedly committed the alleged acts or omissions), the date of each act or omission and the basis for any contention that an alleged act or omission was (a) negligent, (b) grossly negligent or reckless and/or (c) intentional.

7. Describe in detail each action which Plaintiff contends should have been undertaken by each Defendants, specify when the action should have been taken, and the authority under which such action could have been taken.

8. If Plaintiff claims that any Defendant is vicariously liable for the alleged acts or omissions of another person or entity, identify the person or entity for which each Defendant is alleged to be vicariously liable.

### III.  Alleged Notice.

9. If Plaintiff, or any person on Plaintiff's behalf, reported at any time the alleged abuse to any person, including without limitation, any Defendant, law enforcement agency, or officer, identify:

    a.  to whom (specific individual or, if unknown, title) the report was allegedly made;
    b.  when and how the report was allegedly communicated; and
    c.  the information that was allegedly reported.

10. If Plaintiff alleges that any Defendant had *actual* notice, awareness and/or knowledge of (a) the alleged abuse; (b) an alleged propensity of the individual(s) identified in response to Demand No. 3.a to engage in the type of conduct that caused the alleged injury and/or (c) any other alleged notice, for each Defendant identify:

    a.  the information that Plaintiff alleges Defendant had;
    b.  when Plaintiff alleges Defendant first acquired the information;
    c.  how and from whom Plaintiff alleges Defendant acquired such information (for institutional Defendants, identify Defendant's agent, servant, or employee who allegedly acquired the alleged information); and
    d.  any response(s) by each Defendant to such information.

11. If Plaintiff alleges that any Defendant had *constructive* notice, awareness and/or knowledge of (a) the alleged abuse; (b) an alleged propensity of the individual(s) identified in response to Demand No. 3.a to engage in the type of conduct that caused the alleged injury and/or (c) any other alleged notice, for each Defendant identify:

    a. the information that Plaintiff alleges Defendant should have had;

    b. when Plaintiff alleges Defendant should have first acquired the information; and

    c. how and from whom Plaintiff alleges Defendant should have acquired such information (for institutional Defendants, identify Defendant's agent, servant, or employee who allegedly should have acquired the alleged information).

## IV. Alleged Injuries.

12. Identify each and every physical, emotional, psychological and psychiatric injury, disease, diagnosis, condition or syndrome (collectively, "injury") that Plaintiff alleges resulted from the alleged abuse, including:

    a. when the alleged injury first occurred or manifested;

    b. when, where and by whom (name and address) each alleged injury was first diagnosed;

    c. when, where, and by whom (name and address) treatment was sought (indicate all dates of examination and treatment) for each alleged injury;

    d. the dates and length of time of any confinement to bed and/or home allegedly resulting from each alleged injury;

    e. if Plaintiff was confined to hospital or any other treatment facility, provide for each alleged injury the (i) names of each such hospital and/or facility and (ii) the approximate dates of admission and discharge;

    f. the dates and length of time of any incapacitation from activities of daily living allegedly resulting from each alleged injury; and

    g. whether each alleged injury identified is claimed to be permanent in nature, and if not permanent, when it resolved.

13. If Plaintiff alleges that the alleged abuse activated, exacerbated or aggravated any preexisting injury, identify each physical, emotional, psychological and/or psychiatric injury which affected Plaintiff before the alleged abuse that Plaintiff alleges was activated, exacerbated or aggravated as an alleged result of the alleged abuse, including:

    a. when the alleged activation, exacerbation or aggravation first occurred or manifested;

    b. when, where and by whom (name and address) each (i) alleged injury was first diagnosed and (ii) activation, aggravation or exacerbation was first diagnosed;

   c. when, where, and by whom (name and address) treatment for (i) the preexisting injury was sought and (ii) the subsequent activation, aggravation or exacerbation was sought (indicate all dates of examination and treatment) for each alleged injury;

   d. the dates and length of time of any confinement to bed and/or home allegedly resulting from each alleged preexisting injury and subsequent activation, aggravation or exacerbation;

   e. if Plaintiff was confined to hospital or any other treatment facility allegedly resulting from each alleged preexisting injury and subsequent activation, aggravation or exacerbation, provide for each alleged injury the (i) names of each such hospital and/or facility and (ii) the approximate dates of admission and discharge;

   f. the dates and length of time of any incapacitation from activities of daily living allegedly resulting from each alleged preexisting injury and subsequent activation, aggravation or exacerbation; and

   g. whether each alleged injury identified is claimed to be permanent in nature, and if not permanent, when it resolved.

14. If Plaintiff has ever seen, consulted with, or received assistance of any sort from any federal, state, or local social welfare, vocational, rehabilitation or service agency, provide:

   a. The name and address of each such agency;

   b. The dates Plaintiff was seen by or was a client of the agency;

   c. The person or persons who worked with Plaintiff; and

   d. The nature of the services provided by that agency.

### V. Alleged Damages.

15. If Plaintiff claims to have been incapacitated from employment (or self-employment) or to have suffered impaired earnings capacity as an alleged result of the alleged abuse, identify:

   a. the dates that Plaintiff was incapacitated or impaired from employment;

   b. the name of Plaintiff's employer and supervisor(s) during each alleged period of incapacity or impairment;

   c. Plaintiff's position/title during each period of alleged incapacity or impairment;

   d. the reasons for leaving any position during a period of alleged incapacity or impairment;

   e. Plaintiff's wages during each period of alleged incapacity or impairment and for the three years preceding and following each such period;

   f. whether Plaintiff's loss of income was indemnified or compensated by any source(s) and, if so, the source and amount;

   g. the amount and categories of lost earnings claimed;

   h. each of Plaintiff's employers from three years before the first date of alleged abuse through the present, including the time period of each

employment and a description of Plaintiff's job title(s) and duties over time at each employer; and

i. if unemployment or loss of employment is alleged, the duration of unemployment, efforts to find other employment following the last day of employment, and any offers of employment since the last date of employment.

16.     If Plaintiff claims any *future* impairment of earnings capacity or loss of future earnings as an alleged result of the alleged abuse, provide the amount and categories of each such alleged impairment or loss.

17.     State the amount(s), if any, Plaintiff claims as special damages for:

a. physician's services;
b. mental health expenses;
c. psychiatric expenses;
d. psychological expenses;
e. social worker expenses;
f. therapy expenses;
g. medication;
h. medical supplies;
i. hospital expenses;
j. x-rays and all similar diagnostic tests;
k. nursing expenses; and
l. amount and nature of any other special damages claimed.

18.     If Plaintiff claims *future* special damages, identify the categories (enumerated in Demand No. 17) and amounts claimed.

19.     If the Complaint alleges loss of services, society, companionship and/or consortium, state for whom the claim for loss of services is made, that person's relationship to Plaintiff, and the nature, extent and duration of the alleged loss.

20.     If it is alleged in the Complaint that Article 16 of the CPLR does not apply to this action, state the basis for such claim and identify any alleged applicable exception.

21.     If Plaintiff claims punitive damages, describe the basis for such claim.

22.     Other than the alleged abuse, if Plaintiff has at any time (as a minor or as an adult) been a victim of any form of sexual abuse or assault, identify:

a. the individual(s) who caused and/or committed such acts;
b. when and where each act occurred;
c. each act of sexual abuse or assault;
d. to whom such act(s) were reported; and

    e.   any related claim, cause of action, lawsuit or proceeding filed by or on behalf of Plaintiff or in which Plaintiff participated as a witness, including criminal proceedings, and the outcome of each identified lawsuit or proceeding, to the extent known.

23.    If Plaintiff has at any time (as a minor or as an adult) been a victim of any form of sexual abuse or assault other than the alleged abuse, identify each and every physical, emotional, psychological and psychiatric injury sustained as a result of such conduct, including:

    a.   when the alleged injury first occurred or manifested;
    b.   when, where and by whom (name and address) each alleged injury was first diagnosed;
    c.   when, where, and by whom (name and address) treatment was sought (indicate all dates of examination and treatment);
    d.   the dates and length of time of any confinement to bed and/or home allegedly resulting from the alleged injuries;
    e.   if Plaintiff was confined to hospital or any other treatment facility, provide the (i) names of each such hospital and/or facility and (ii) the approximate dates of admission and discharge;
    f.   the dates and length of time of any incapacitation from activities of daily living allegedly resulting from the alleged injuries; and
    g.   whether each alleged physical, emotional, psychological and/or psychiatric injury, disease, diagnosis, condition or syndrome identified is claimed to be permanent in nature, and if not permanent, when it resolved.

**VI. Demands Specific for Certain Institutional Defendants.**

24.    Complete the additional demands contained in the applicable appendix as appropriate for the named Defendants.

All parties retain their rights to object and/or to move with regard to the foregoing demands in accordance with the CPLR and existing case law. The fact that these demands are made a part of the Case Management Order does not in any way alter or waive a party's right to object and/or to move with regard to any of the demands herein.

**Appendix of Additional Demands for Particulars**
**Roman Catholic Institutions**

1. With respect to the alleged abuse identified in Demand No. 3 identify:

 a. the relationship of each person identified in response to Demand No. 3.a to each diocesan and/or archdiocesan and/or parish and/or parochial school Defendant;

 b. whether the person(s) identified in response to Demand No. 3.a was a member of a religious order, religious institute, religious congregation, or religious society, the name of such order, institute, congregation, or society;

 c. whether the person(s) identified in response to Demand No. 3.a was a lay employee or volunteer at a parish or school within the territorial confines of a diocese or archdiocese, and provide the name of such parish and/or school;

 d. whether the person(s) identified in response to Demand No. 3.a was a lay employee or volunteer of a religious order, religious institute, religious congregation, or religious society, and provide the name of such religious order, institute, congregation, or society.

**Appendix of Additional Demands for Particulars**
**City of New York and New York City Department of Education**

    1.    If the City of New York is a named Defendant, identify the agency(ies) involved.

    2.    If the Department of Education is a named Defendant, identify the school(s) Plaintiff attended at the time of the alleged sexual abuse.

    3.    If Plaintiff claims that Plaintiff missed school as a result of the injuries sustained from the incident, state the approximate number of days lost from school.

    4.    If Plaintiff alleges negligent supervision of Plaintiff, so state.

    5.    If Plaintiff alleges negligent supervision of any other individual, agency, organization, or other entity, identify each such individual, agency, organization, or other entity who Plaintiff alleges the municipal Defendant negligently supervised.  If the action names more than one municipal Defendant, provide the requested information for each such Defendant.  If you cannot identify an individual by name, please provide the individual's title, role, or other information sufficient to reasonably identify that individual.

## Appendix of Additional Demands for Particulars
## Private Educational Institutions

1.      If Plaintiff claims that Plaintiff missed school as a result of the injuries sustained from the incident, state the number of days lost from school.

2.      If Plaintiff alleges negligent supervision, the following items are additionally demanded:

a.  For every individual who allegedly failed to provide adequate supervision, state (i) the name of the individual; (ii) the address and phone number of the individual; (iii) the name of the entity who employs(ed) the individual; (iv) the title of the individual; and (v) when the individual allegedly failed to provide adequate supervision. If more than one individual allegedly failed to provide adequate supervision, please respond to this demand, including all subparts, as to each individual.  If you are unable to provide any of the above information, please provide a description reasonably sufficient to identify each individual. This demand includes all individuals, even if employed by any of the parties.

b.  If it is alleged that an agency, organization, and/or other entity failed to provide adequate supervision, state (i) the name of the agency, organization, and/or other entity (ii) the address and phone number of the agency, organization, and/or other entity; (iii) the personnel within the agency(ies), organization(s) and/or other entity(ies) allegedly responsible for the supervision of the person(s), agency(ies), organization(s), and/or other entity(ies) identified in item 4(c), below; (iv) the title(s) of the personnel within the agency, organization and/or other entity allegedly responsible for the supervision of the person, agency, organization, and/or other entity identified in item 4(c), below; and (v) when the agency, organization, and/or other entity allegedly failed to provide adequate supervision.  If more than one person, agency, organization, and/or other entity allegedly failed to provide adequate supervision, respond to this demand, including all subparts, as to each agency, organization and/or other entity.  If you are unable to provide any of the above information, provide a description reasonably sufficient to identify each individual, agency, organization, and/or other entity. This demand includes all individuals, agencies, organizations, and/or other entities, even if employed by or an agency, related entity, or subdivision of any of the parties.

9

    c.   Identify the name or names of the person(s), agency(ies), organization(s), and/or other entity(ies) it is alleged received inadequate supervision.

    d.   Identify what conduct, if undertaken, would have removed the risk of harm to Plaintiff.

3.      If Plaintiff allege negligent hiring or retention of an individual, the following items are also additionally demanded:

    a.   For every individual who allegedly was negligent as to the hiring or retention state (i) the name of the individual; (ii) the address and phone number of the individual; (iii) the name of the entity that employs(ed) the individual; and (iv) the title of the individual. If more than one person allegedly was negligent as to the hiring or retention, please respond to this demand, including all subparts, as to each individual. If you are unable to provide any of the above information, provide a description reasonably sufficient to identify each individual. This demand includes all individuals, even if employed by any of the parties.

    b.   For every agency, organization, and/or other entity that allegedly was negligent as to hiring or retention state (i) the name of the agency, organization, and/or other entity; (ii) the address and phone number of the agency, organization, and/or other entity; (iii) when the agency, organization, and/or other entity allegedly was negligent; and (iv) the personnel (including title(s)) within the agency(ies), organization(s) and/or other entity(ies) responsible for the allegedly negligent hiring or retention. If more than one person, agency, organization, and/or other entity allegedly was negligent as to hiring or retention, please respond to this demand, including all subparts, as to each agency, organization and/or other entity. If you are unable to provide any of the above information, please provide a description reasonably sufficient to identify each individual, agency, organization, and/or other entity. This demand includes all agencies, organizations, and/or other entities, even if employed by an agency, related entity, or subdivision of any of the parties.

    c.   State what conduct, if undertaken, would have removed the risk of harm to Plaintiff.

    d.   State in what manner the individual(s) was(were) unfit for employment prior to being hired and what information would have been disclosed by reasonable inquiry or investigation that would have shown a propensity for the individual to engage in the conduct alleged in the Complaint.

10

SUPREME COURT OF THE STATE OF NEW YORK
COUNTIES OF BRONX, KINGS, NEW YORK, QUEENS AND RICHMOND
_____

In re:  CHILD VICTIMS ACT LITIGATION          EXHIBIT C to CASE MANAGEMENT
                                              ORDER No. 2, Sec. IX.C.3


_____


### STANDARD AUTOMATIC DISCLOSURES DIRECTED AT DEFENDANTS


Defendants' response to Automatic Disclosures:  Absent good cause shown and pursuant to Section IX of Case Management Order No. 2, and any subsequent Case Management Order issued by the Court, within 30 days of plaintiff's service of responses to the Standard Automatic Disclosures Directed at Plaintiffs and the Common Demand for a Verified Bill of Particulars in a CVA action, defendant shall serve upon plaintiff the following:

1. All documents in the possession of the responding defendant prior to and up to one full year after the last date of abuse as alleged in the complaint and bill of particulars relating to any allegations of sexual abuse against the alleged perpetrator arising from conduct that occurred prior to and during the abuse alleged including, but not limited to, statements, written reports, audio recordings, video recordings, correspondence, emails, memoranda, and notes, and materials transmitted to any police department, any Office of the District Attorney, U.S. Attorney's Office, State Attorneys General or relevant public prosecutor.

2. If it is alleged that a priest or clergy member abused plaintiff, please provide all personnel files of the alleged perpetrator maintained by the responding religious organization defendant.  To the extent not included in the personnel file of the alleged perpetrator, defendants shall also provide (i) all records pertaining to the assignment changes of the priest or clergy member between parishes and/or schools; (ii) a list of all parishes where the priest or clergy member was assigned inclusive of the start and end dates; and (iii) all alleged "confidential" or "secret" files.

3. If it is alleged that a (i) physician or other medical professional, or (ii) teacher or other school employee, (iii) troop or group leader (iv) non-catholic religious leader or employee, or (v) other alleged perpetrator sexually abused plaintiff, defendants shall provide all personnel files of the alleged perpetrator. To the extent not included in the personnel file of the alleged perpetrator, defendants shall also provide (i) all records pertaining to the transfer of the alleged perpetrator between non-catholic religious entities, medical institutions/departments, schools, troops or other locations; (ii) a list of all non-catholic religious entities, medical institutions, schools, troops or other locations where the alleged perpetrator was assigned inclusive of the start and end dates;

and (iii) all alleged "confidential," "secret," "ineligible volunteer," "perversion," human resources or similar files.

4. If it is alleged that a foster parent or individual residing within the foster home or placement sexually abused plaintiff during the time period alleged in the complaint and bill of particulars, defendant shall provide, for a period of two years prior to and including the earliest date of sexual abuse as alleged in the complaint and bill of particulars, the alleged perpetrator's file and the file for each home or placement where plaintiff alleges such sexual abuse occurred, to the extent such files exist and are within the custody and control of the responding defendant.

5. If a background check(s) was(were) conducted of the alleged perpetrator:

   a. All records documenting the background check(s) including the background check results and date(s) the background check(s) were performed;
   b. The name of the person or entity that performed the background check(s);
   c. The name(s), address(es) and phone number(s) of any references that were allegedly checked.

6. All written statements, tape recordings, videotapes or any transcripts or notes thereof, made by or on behalf of plaintiff by any person, regarding the allegations set forth in the complaint and bill of particulars in accordance with CPLR 3101 (e).

7. With respect to allegations against a school, upon presentation of an executed authorization from plaintiff:

   a. complete copy of all school records pertaining to plaintiff;
   b. academic transcripts and report cards;
   c. medical records;
   d. counseling records, student health or mental health records; and
   e. disciplinary records.

8. With respect to allegations of sexual abuse by a foster parent or by an individual residing within the foster home or placement, or to allegations against a foster placement entity, upon presentation of an executed authorization from plaintiff, the responding defendant shall provide a complete copy of records pertaining to plaintiff's placement to the extent such records exist and are within the custody and control of the responding defendant.

9. All names and aliases used by the alleged perpetrator to the extent known by the responding defendant.

10. The names and/or last known addresses of witnesses who possess information of the claimed abuse against plaintiff as alleged in the complaint and bill of particulars.

2

11. All documents in existence at the time of the alleged abuse setting forth any of the responding defendant's policies, procedures, protocols, guidelines, rules and/or regulations concerning the protection of minors from sexual abuse, the reporting of sexual abuse of children, and the protocols for receiving allegations of sexual abuse and investigating such complaints.

12. The complete and full insurance agreements, including all additional, concurrent, excess or umbrella coverage that may be applicable under which the insurers of the responding defendant may be liable to satisfy part or all of a judgement that may be entered in the above-entitled action to indemnify or reimburse payments made to satisfy a judgment in the above-entitled action, or to comply with their duty to defend.

    a. In the event the responding defendant is unable to locate a copy of any policies that have been identified as possibly providing coverage for the above-entitled action, the responding defendant shall state: (i) the name(s) and address(es) of the insurance carrier(s), (ii) the applicable policy limits of coverage, (iii) the policy number or numbers and coverage amounts, and (iv) the effective dates thereof.

Objections to discovery based on privilege, confidentiality, immunity, or other protection from disclosure shall state with some specificity that the documents in each category are entitled to protected status; expressly justify the privilege asserted for each category; and describe the nature of the documents to be protected in a manner that will enable the other parties to assess the claim without revealing the privileged information. No documents or information subject to a claim of privilege, confidentiality or immunity from disclosure shall be produced until the claim of privilege, confidentiality or immunity is resolved by the Court.

Nothing contained in these automatic disclosures shall be considered a waiver of any party's rights to pursue any further discovery including, but not limited to, discovery requested above, but for a different time frame.

These demands shall be deemed to continue during the pendency of the CVA action, including the trial thereof.

All parties retain their rights to object and/or to move with regard to the foregoing demands in accordance with the CPLR and existing case law. The fact that these demands are made a part of the Case Management Order does not in any way alter or waive a party's right to object and/or to move with regard to any of the demands herein.